UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA and the COMMONWEALTH OF MASSACHUSETTS *ex rel.* DAVID PERRY,<br><br>   Plaintiffs,<br><br>v.<br><br>BOURNEWOOD INC. d/b/a BOURNEWOOD HEALTH SYSTEMS, and FIRST PSYCHIATRIC PLANNERS, INC.,<br><br>   Defendants. | No. 21-cv-11483-WGY |

**THE UNITED STATES' AND COMMONWEALTH OF MASSACHUSETTS' OPPOSITION TO RELATOR DAVID PERRY'S MOTION TO <u>DETERMINE RELATOR'S SHARE OF SETTLEMENT PROCEEDS</u>**

On October 1, 2024, the United States, the Commonwealth of Massachusetts, and relator David Perry entered into a settlement agreement (the "Settlement") with defendant First Psychiatric Planners, Inc. d/b/a Bournewood Health Systems and Bournewood Hospital (collectively, "Bournewood"), resolving allegations that Bournewood violated the Anti-Kickback Statute ("AKS") and the False Claims Act ("FCA") and Massachusetts False Claims Act ("MFCA").  Following that Settlement, in which Bournewood agreed to pay up to $6.5 million, the United States and Massachusetts (collectively, the "governments") and the relator have disagreed as to whether Perry aided in the planning and initiation of defendant Bournewood's fraud scheme.  Although Perry seeks over $1.4 million (22%) of the governments' recovery, under 31 U.S.C. § 3730(d)(3) of the FCA and M.G.L. c. 12, § 5F(5) of the MFCA, this Court is authorized to reduce Perry's relator's award to whatever amount it deems appropriate (including nothing at all) if it determines that Perry helped "plan and initiate" the fraud that formed the basis of his qui tam complaint.

1

The governments contend that Perry did plan and initiate the scheme together with Bournewood, which disqualifies him from any relator award. Beginning in February 2009, Perry, the then-owner of Recovery Educational Services, Inc. ("RES"), a sober home, partnered with Bournewood to provide illegal kickbacks in the form of free sober housing for patients recovering from substance use, to induce those patients to enroll in and attend Bournewood's Partial Hospital Program ("PHP"). His participation in this scheme, which continued for nearly ten years, resulted in federal and state healthcare programs paying millions of dollars in false claims tainted by kickbacks, in violation of the federal AKS, *see* 42 U.S.C. § 1320a-7b, and the Massachusetts Anti-Kickback Statute ("MAKS"), *see* MG.L. c. 175H, § 3. For his part in the scheme, Perry negotiated with Bournewood to receive a daily fee for every Bournewood PHP patient that RES housed. Perry even boosted his profits by referring RES residents to Bournewood when those residents expressed concerns about being able to pay rent, but had no clinical need to be admitted to Bournewood's PHP. Because Perry helped devise and execute the scheme, and received more than $1 million dollars from Bournewood from the scheme, this Court should reduce Perry's award to zero.

In the alternative, if the Court finds that Perry is entitled to share in the governments' recovery, the Court should nevertheless hold that the award should be reduced below 15%, as permitted by 31 U.S.C. § 3730(d)(3) of the FCA and M.G.L. c. 12, § 5F(5) of the MFCA. If, however, the Court concludes that Perry's relator's award should not be reduced, the governments respectfully request that the parties be given the opportunity to negotiate the amount of the relator's award because the parties have not, to date, substantively engaged in settlement discussions due to their dispute. Resolving the issue of whether Perry planned or initiated the fraud scheme will either (i) resolve the relator share dispute in full (if the Court rules

in the governments' favor) or (b) inform and facilitate the parties' future discussions as to the amount of relator award to which Perry is entitled.

## RELEVANT BACKGROUND

### I. Factual Background[1]

Perry was the sole owner and President of RES, a sober home located in Roxbury, MA, that operated between July 1, 2008 and August 2018. *See* Dkt. No. 29, ¶ 14. Bournewood is a behavioral health organization that provides inpatient and outpatient mental health and substance use recovery services. *Id.* ¶ 15. One of Bournewood's outpatient programs is a PHP that offers intensive drug treatment to patients transitioning from an inpatient level of care. *Id.*



In July 2003, for example, Bournewood entered into a one-year agreement with a Woburn sober home to reserve two sober beds for Bournewood's PHP patients, but the arrangement ended in July 2004. *See* Dkt. No. 29, ¶ 96.

---

[1] The facts set forth in this opposition come from written disclosures and documentary evidence Perry provided to the United States Attorney's Office in the District of Massachusetts and the Massachusetts Attorney General's Office in support of his allegations and in accordance with the requirements of the FCA and the MFCA, *see* 31 U.S.C. § 3730(b)(2) and M.G.L. c. 12, § 5C(3), as well as the governments' Amended Complaint in Intervention and Perry's qui tam complaint.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████

Perry agreed to partner with Bournewood and began negotiating the financial and logistical details of the arrangement. *Id.* On or around June 12, 2009, Perry and Bournewood memorialized the following terms:

- Bournewood would pay RES $24 a day, including weekends and holidays, for each bed used for Bournewood's PHP patients;[2]

- Payment for housing would be made to RES so long as the patient attended Bournewood's PHP. A patient's unexcused absence from Bournewood's PHP on a given day would result in Bournewood suspending payment to RES and the patient being notified that they were personally responsible for paying RES for housing; and

- Bournewood would be responsible for transporting patients to and from RES to Bournewood each weekday.

*See* ████████████ Exhibit E.

The arrangement between Bournewood and Perry proved fruitful for Perry. ████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[2] ██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████

4

██████████████████████████████████████████████████
██████████████████████████████

Perry did more than simply provide beds to PHP patients; he also performed a number of tasks that aided Bournewood's efforts to induce numerous patients to attend its PHP. ████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ Perry pushed for more money from Bournewood in or around September 2016, and Bournewood ultimately agreed to increase its payment to Perry and RES from $24 per-day, per-bed to pay $30 per-day, per-bed to Perry and RES to house Bournewood's PHP patients. *See* Dkt. No. 29, ¶¶ 146-7. *See also* Exhibit F. ████████████

████████████████████████████████████████

████████████████████████████ An April 12, 2017 Memorandum of Services ("MOS"), which Perry drafted and presented to Bournewood management, detailed all the duties that Perry and RES performed for Bournewood's PHP patients, including numerous services and amenities that exceeded RES's contractual responsibilities with Bournewood. *See* Exhibit D, April 12, 2017 "Memorandum of Services" Provided Exclusively to the Patients of the Intense Out-Patient Day Program, Bournewood Hospital, Chjestnut (sic) Hioll (sic) Location from Perry to Mona Bastide, Bournewood's Director of Social Services and Ambulatory Care. These duties included transporting patients to and from Bournewood; transporting patients from referring facilities to Bournewood for treatment; taking a daily attendance census that Bournewood utilized to bill for its services, including to federal payors; conducting urine drug testing of

Bournewood's PHP patients at least three times a week; providing linens to Bournewood's PHP patients; and providing a "welcome gift bag" to Bournewood's PHP patients that contained toiletries and small food items.  *Id.*

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████ almost certainly understood that Bournewood would be able to bill insurers, including Medicaid and Medicare, for the provision of these unnecessary PHP services because Perry routinely maintained intake forms related to Bournewood that identified a resident's healthcare insurance. *See, e.g.,* Exhibit G, Examples of RES's Resident Intake Sheets

Bournewood utilized RES until March 2018, and terminated its relationship with Perry only after Massachusetts indicted him for 36 criminal offenses relating to his operation of RES.[3] *See* Dkt. No. 29, ¶ 163.  According to the Massachusetts Attorney General's Office, "[it's] investigation revealed that from 2012 through 2017, while Perry was operating RES and practicing law, he sexually exploited young men at RES and at his residence in Reading in exchange for drugs, money, rent and housing, and legal representation." *See* https://www.mass.gov/news/lawyer-who-ran-sober-home-pleads-guilty-sentenced-to-jail-in-connection-with-supplying-drugs-to-recovering-substance-users-for-sex (last accessed on December 1, 2024). As the governments' Amended Complaint in Intervention describes, several Bournewood PHP patients that Bournewood paid to house in RES testified in the grand jury proceedings against Perry.[4]  *See* Dkt. No. 29, ¶¶ 113, 121, 129 – 31.  Moreover, Bournewood's Lead Intake Coordinator testified to the grand jury that "over a half dozen" patients each year for nearly ten years told him that Perry sexually propositioned them.  *Id.* ¶¶ 153- 56.  Thus, the manner in which Perry ran RES is relevant to his relationship with Bournewood and potential

---

[3] The governments discussion of Perry's criminal behavior was not "unrelated to Defendants' fraud" or "not relevant." *See* Dkt. No. 59, at 3, 11-12.  The governments' discussion of Perry's wrongdoing centered around Bournewood's decision to continue to send patients to RES despite being aware that his activities were detrimental to patients' sobriety and safety.  In doing so, the governments reasonably sought to present evidence of Bournewood's scienter and motive by emphasizing that Bournewood placed profit above the safety and well-being of its patients.

[4] The governments do not have enough information as to whether the patients who testified in the grand jury were Perry's victims because the state court required that the portions of the grand jury transcript unrelated to Bournewood should remain redacted.

relator award because it suggests that Perry principally was concerned with profit over patient safety.

Perry and RES made significant amounts of money from partnering with Bournewood to provide the housing kickbacks. Between September 2013 and May 2018 (the period covered by the Settlement), Bournewood paid RES and Perry $721,000 to house 1,158 substance use recovery patients covered by Medicare and/or Medicaid. *See* Dkt. No. 29, ¶ 150. Including the years prior to September 2013, RES and Perry housed 2,490 patients covered by Medicare and/or Medicaid between 2009 and 2018 and received $1,086,534 from Bournewood under their arrangement.

The substantial payments from Bournewood to Perry and RES reflect RES's role as Bournewood's almost exclusive housing partner for nearly a decade. Despite the fact that Bournewood ceased doing business with RES by March 2018 (five years before the end of the relevant period covered by the Settlement), RES and Perry housed nearly 46% of the total number of Bournewood's PHP patients who received free sober housing as an inducement to enroll in and attend Bournewood's PHP between 2009 and 2023. *See* Dkt. No. 29, ¶ 6. Between September 2013 and May 2018, RES and Perry housed approximately 1,235 (64%) of the 1,922 PHP patients Bournewood paid to house in sober homes in exchange for enrolling in and attending Bournewood's PHP. Approximately 90% of the 1,235 patients were insured by federal and state healthcare programs. *See Id.* ¶ 7.

In contrast to RES, the Malden and Quincy sober homes referenced earlier combined to house 8 patients *in total* during the same time frame, receiving less than $6,000 from Bournewood. *See* Dkt. No. 29, ¶¶ 135, 140. The only other sober home that comes close to housing the number of patients RES did for Bournewood is A Vision from God, LLC d/b/a

8

Brady's Place, which housed approximately 1,094 Bournewood PHP patients and received $643,395 from Bournewood. *See Id.* at, ¶¶ 192-3. Notably, Bournewood's relationship with Brady's Place began in November 2018, five months after Bournewood ended its relationship with RES because of Perry's criminal indictment. *See Id.* ¶¶ 151, 154-157. And, like RES, Brady's Place was within relatively close proximity to the location of Bournewood's PHP. *See id.* ¶ 184 (located in Boston when agreement was made).

## II.    Perry's Contributions to the Investigation, Litigation, and Settlement

On or about September 10, 2021, shortly after his release from prison, Perry filed a qui tam complaint in the United States District Court for the District of Massachusetts ("Relator's Complaint"), alleging that Bournewood violated the FCA and MFCA, by and through the AKS and MAKS, by paying "kickbacks, remuneration, and/or financial or in-kind inducements to patients in the form of free housing to participate in and/or use Defendants' medical services which are billed to Medicaid/MassHealth, Medicare, and/or other federally-funded government healthcare programs." *See* Dkt. No. 1, ¶ 1. Perry described himself as the President and operator of RES who "negotiated the rental terms for housing that Bournewood contracted with RES to pay for its patients." *Id.* ¶ 5. He further alleged that Bournewood and First Psychiatric Planners, Inc., which at the time he believed to be a separate but associated business, "conspired, by their actions and agreement, to effectuate the payment of Free Housing for Patients to obtain and control their medical care in order to bill Government Healthcare Programs." *Id.* ¶ 23.

Between September 15, 2021 and November 10, 2021, in accordance with the requirements of 31 U.S.C. § 3730(b)(2) and M.G.L. c. 12, §5C(2), Perry provided the governments with copies of his qui tam complaint; an initial written disclosure outlining how he came to learn of his allegations against Bournewood; three supplemental written disclosures; and

9

approximately ten documents in support of his allegations including bank records, copies of checks received from Bournewood, samples of patient intake forms and his handwritten RES weekly census charts, and the MOS. Perry also met with the governments for an interview in November 2021.

Over the next two years, the government conducted a thorough investigation which included, but was not limited to, the receipt and review of voluminous documentation from Bournewood and third-party sources; numerous witness interviews including former Bournewood employees, referring facilities employees, sober home representatives, and clinicians; and the acquisition and review of state grand jury transcripts related to Massachusetts' investigation of Perry. On September 15, 2023, the governments intervened and filed a Complaint-in-Intervention. *See* Dkt. No. 27. On October 2, 2023, the governments filed an Amended Complaint-in-Intervention. *See* Dkt. No. 29. On October 1, 2024, the governments, Perry, and Bournewood entered into the Settlement, wherein Bournewood agreed to pay the governments $5.5 million plus interest over four years, with the potential to pay an additional $1 million if certain financial conditions are satisfied. *See* Dkt. No. 58. On October 4, 2024, the governments and Perry filed a Notice of Joint Stipulation of Partial Dismissal which informed the Court, in relevant part, that the parties had not come to an agreement on the relator's award. *Id.*

The governments and Perry made initial attempts to resolve the relator's award dispute. However, the parties' disagreement concerning Perry's entitlement to a relator's award prevents the parties from resolving the share dispute. On November 8, 2024, Perry filed a Motion to Determine Relator's Share of Settlement Proceeds, asking the Court to award him $1.4 million (22%) of the governments' recovery.

**RELEVANT LEGAL BACKGROUND**

Although the FCA and the MFCA entitle a relator "to receive at least 15 percent but not more than 25 percent" of the proceeds of the action or settlement of the claim "depending on the extent to which the person substantially contributed to the prosecution of the action," *see* 31 U.S.C. § 3730(d)(1) and M.G.L. c. 12, §5F(1), both statutes also permit a court to reduce a relator's award based on the relator's role in instigating and implementing the fraud.  More specifically, both the FCA and the MFCA provide that, if the court finds that the action "was brought by a [relator] who planned and initiated the violation of [section 3729 of the FCA and/or sections 5B to 5O of the MFCA] upon which the action was brought," the court "may, to the extent the court considers appropriate, reduce the share of the proceeds of the action." *See* 31 U.S.C. § 3730(d)(3) and M.G.L. c. 12, § 5F(5).  The MFCA also expressly permits a court to eliminate a relator's award if deemed appropriate under the circumstances. *See* M.G.L. c. 12, §5F(5).  While the FCA does not explicitly state the same, § 3730(d)(3) permits courts to reduce a relator's award to zero, effectively producing the same result. *See, e.g., United States ex rel. Stearns v. Lane*, 2010 WL 3702538 at *5 (D. Vt. Sep. 15, 2010) (reducing relator's award to zero where relator planned and initiated the FCA violation and derived personal benefits from the fraud scheme with the defendant); *United States ex rel. Marchese v. Cell Therapeutics, Inc.*, 2007 WL 4410255 at *7 (W.D. Wash. Dec. 14, 2007) ("If, however, a relator 'planned and initiated' the fraud, his share may be reduced to zero percent.").  Moreover, when assessing whether to reduce a relator's award, the FCA and MFCA state that a court may also "tak[e] into account the role of [the relator] in advancing the case to litigation and any relevant circumstances pertaining to the violation." *See* 31 U.S.C. § 3730(d)(3) and M.G.L. c. 12, § 5F(5).

No court has expressly opined on the meaning of "plan and initiate" as to either

§ 3730(d)(3) or § 5F(5). But it is a well-settled rule of statutory interpretation that courts should rule in accordance with the plain meaning of a statute. *See Schroeder v. United States*, 793 F.3d 1080, 1086 (9th Cir. 2015). To the extent a statute may present with multiple interpretations, courts may look to a provision's legislative history to ascertain its meaning. *See Schroeder,* 793 F.3d at 1085 (internal citations omitted) ("When a statute is susceptible to two or more meanings, we may consider legislative history."). On that score, one of the principal authors of the 1986 qui tam provisions of the FCA, Senator Charles E. Grassley, proposed § 3730(d)(3) to the FCA in 1988 to clarify that "Congress did not intend that the qui tam amendments [§ 3730(d)(1)] would encourage individuals to first be a party to a false claims practice of fraud and later bring a qui tam action against other participants . . . with the expectation of receiving a substantial share of the suit's recovery." 134 Cong. Rec. S16697-01 (Oct. 18, 1988). He went on to state that:

> My amendment simply clarifies that in an extreme case where the qui tam plaintiff was a principal architect of a scheme to defraud the Government, that plaintiff would not be entitled to any minimum guaranteed share of the proceeds of the action . . . . This amendment is [not] intended to apply to those qui tam plaintiffs who may have had some minor role in the false claims conduct.

*Id.* Senator Grassley's co-author for the 1986 qui tam provisions to the FCA, Senator Dennis DeConcini, further advocated that § 3730(d)(3) was proposed because the FCA's guarantee of a "minimum amount of recovery . . . was not meant to be an incentive for individuals who are the main force behind a false claims scheme." *Id.*

## ARGUMENT

### A. Perry Acted in Concert with Bournewood to Plan and Initiate Bournewood's Fraud Scheme, Warranting a Reduction in His Relator's Award

Because Perry planned and initiated the fraud scheme with Bournewood that formed the basis of his qui tam, and because he has already made over $1 million from his role in the scheme, the Court should conclude that Perry is not entitled to a relator's award in accordance

with 31 U.S.C. § 3730(d)3) and M.G.L. c. 12, § 5F(5).  This Court should not permit Perry to profit *again* from his role in aiding Bournewood's submission of false claims and award him an additional $1.4 million from the governments' recovery.

Perry played a pivotal role in the false claims scheme.  Bournewood's prior involvement with sober homes, before meeting Perry in February 2009, had largely failed to produce Bournewood's desired result: the certainty of patients attending PHP services on a regular basis so that Bournewood could bill insurers for the PHP services rendered. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Perry personally negotiated with Bournewood and agreed upon financial terms whereby he and RES would receive $24 a day per bed for each patient Bournewood sent to RES, so long as the patient was enrolled in and attended Bournewood's PHP.  *See* Exhibit E, Affiliation Agreement between Bournewood and RES dated June 12, 2009. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ For all of his efforts, Bournewood rewarded Perry with an increase in the daily rate paid to RES from $24 per day per bed to $30 per day per bed beginning in 2013—a rate which Perry admits was higher than the market rate he was receiving for non-Bournewood PHP patients.  *See* ▇▇▇▇▇▇▇ *see also* Exhibit E and Exhibit F, Affiliation Agreement between Bournewood and RES effective September 1, 2016.

Perry was not a passive observer to or a minor actor in Bournewood's fraud scheme; he was an active and significant initiator and planner.  *See* 134 Cong. Rec. S16697-01 (Amendment No. 3736). ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

13

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████

Perry's April 12, 2017 MOS lays out in particular detail all the efforts Perry undertook to maintain his financial relationship with Bournewood between 2009 through 2018. *See* Exhibit D. This included, most notably, transporting patients to and from RES and Bournewood; transporting patients from referring facilities to Bournewood; performing a daily patient census to assist Bournewood with its billing PHP services for the patients; and conducting urine drug testing at least three times a week. *Id.* ███████████████████████████

███████████████████████████████████████████████

████ ██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████

Notably, the legislative history behind § 3730(d)(3) of the FCA, which by analogy also applies to § 5F(5) of the MFCA, reveals that a reduction in the relator's award was intended for those relators, like Perry, who were a "driving force behind the false claims activities disclosed in their lawsuits." *See* 134 Cong. Rec. S16697-01 (Sen. DeConcini); *see also id.* (Sen. Grassley) (stating the provision was not intended to apply to "plaintiffs who may have had some more

minor role in the false claims act conduct"). Without Perry, Bournewood's fraud would not have succeeded, nor continued to the extent it did for a decade.

As Bournewood had hoped, Perry and RES helped Bournewood stop "losing patients." In fact, he did more than that—he helped Bournewood increase the number of patients that sought and attended Bournewood's PHP, thereby increasing Bournewood's ability to bill insurers—including Medicare and Medicaid—for PHP services rendered and PHP revenue. Bournewood's prior relationships with sober homes were brief and minor. Bournewood's relationship with Perry and RES lasted nearly a decade, and resulted in kickbacks being paid, in the form of free sober housing, to thousands of patients Perry knew to be covered by Medicare and Medicaid. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Perry's financial relationship with Bournewood ended only because of his indictment on state criminal charges. Had Massachusetts not indicted Perry for these criminal offenses in 2018, there is no reason to believe his relationship with Bournewood would have ended or that Perry would have filed this qui tam.

For his efforts in aid of the scheme, Perry and RES received $721,000 from Bournewood to house PHP patients at RES between September 2013 and May 2018. Bournewood did not pay any other sober home as much money between 2009 and 2023, nor did it send any other sober home as many patients as it sent to RES. Perry already has reaped a considerable financial benefit from the fraud scheme. Absent a reduction in his relator's award, he would gain a massive financial windfall of between 15% and 25% of the Settlement proceeds for reporting the *very fraud* he helped plan and initiate. *See generally United States ex rel. Barajas v. Northrop Corp.*, 147 F.3d 905, 908 (9th Cir. 1998) (highlighting the "peculiarity" that a dishonest

15

employee could become wealthy from the settlement proceeds derived from an FCA qui tam as grounds for a possible reduction in the relator's award). Accordingly, pursuant to 31 U.S.C. § 3730(d)(3) and M.G.L. c. 12, § 5F(5), the Court should reduce Perry's relator award to zero, or at the very least below the minimum 15% threshold set by 31 U.S.C. § 3730(d)(1) and M.G.L. c. 12, § 5F(1).

Perry advances two arguments as to why he should not be considered to have "planned and initiated the violation [of the FCA and the MFCA] upon which [his] action was brought." Dkt. No. 60, at 12-17. Neither argument justifies Perry receiving a relator's award.

First, Perry contends that because Bournewood had contracts with sober homes prior to reaching out to him in February 2009, he could not have "planned and initiated" the FCA and MFCA violation that underlies the allegations in his complaint. But Perry and Bournewood planned and initiated *this* fraud scheme; whether Bournewood engaged in *another* fraud scheme is irrelevant. Put differently, the claims at issue in this case emanate from the fraud scheme between Perry and Bournewood, not Bournewood and some other sober home operator. Moreover, the fact that Bournewood tried unsuccessfully to execute the kickback scheme with others does not minimize the significance of Perry's participation. Perry was able to do for Bournewood what the other sober home operators could not. By his own admission Perry's sober home, RES, served as the "primary sober house" for Bournewood during that span of time, and he personally undertook numerous actions to maintain and facilitate this relationship for his own financial gain. Perry's arrangement with Bournewood, which continued for nearly a decade, resulted in Bournewood submitting thousands of false claims tainted by kickbacks in the form of free sober housing—the very allegation that forms the basis of the action he brought.

Moreover, neither § 3730(d)(3) nor § 5F(5) requires the Court to find that Perry was the *sole* planner and initiator of the fraud before reducing Perry's award. A plain reading of the statutes themselves reveals no such requirement. The one federal district court to analyze this issue held that a relator who planned the scheme with another was not entitled to an award. In *United States ex rel. Stearns v. Lane,* the district court reduced a relator's award to zero when it determined that the relator, a Section 8 tenant, had agreed with the landlord to pay extra rent in violation of the United States Department of Housing and Urban Development's Housing Assistance Payment ("HAP") contract, but filed a qui tam complaint alleging that the landlord's breach of the HAP contract had caused an FCA violation. *See* 2010 WL 3702538 at *5 (D. Vt. Sep. 15, 2010). Here, like in *Lane*, Perry partnered with Bournewood to plan and commit the fraud and he now seeks to share in the governments' recovery. Both the FCA and the MFCA also counsel that Perry's importance to Bournewood's scheme, and his profit from that scheme, should be considered as "any relevant circumstance[] pertaining to the violation" when evaluating whether a reduction in the relator's award is warranted. *See* 31 U.S.C. § 3730(d)(3) and M.G.L. c. 12, § 5F(5).

Second, Perry argues that he could not have "planned and initiated" the violation of the FCA or the MFCA because he did not possess the intent to violate either statute. A plain reading of § 3730(d)(3) of the FCA and § 5F(5) of the MFCA, however, reveals that the relator's intent in planning and initiating a violation of the statutes is *not* an element for consideration when evaluating whether to reduce a relator's award. "It is well established that the starting point in discerning congressional intent is the existing statutory text and that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Schroeder,* 793 F.3d at 1082-3 (citations and

internal quotation marks omitted)).  Neither § 3730(d)(3) nor § 5F(5) require that a relator possess any degree of scienter or knowledge of the law to warrant a relator's award reduction.[5]  Rather, the statutes only require that a court evaluate whether a relator "planned and initiated the violation of [the FCA and MFCA] upon which the action was brought."  *See* 31 U.S.C. § 3730(d)(3) and M.G.L. c. 12, § 5F(5).  Courts can certainly consider a relator's intent when evaluating the extent to which a relator's award should be reduced under § 3730(d)(3) or § 5F(5), but the relator's intent does not impact whether the relator "plan[ned] and initiate[d] the violation . . . upon which the action was brought."

Even if this Court considers Perry's intent as a relevant factor for assessing a reduction in the relator's award, his claims of ignorance as the foundation for his lack of intent are belied by several factors.  Perry's claim that he did not know Bournewood was submitting claims to insurers for reimbursement of PHP services runs counter to his conversations with Bournewood representatives in February 2009, in which he discussed Bournewood's concerns of "losing patients." ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

And Perry's claim that he was unaware of the AKS and MAKS, and therefore did not know the kickback scheme he helped to initiate was illegal until after his release from state prison, is also unavailing.  Perry is not a typical relator.  He was, at the time of his negotiations with Bournewood in February 2009, and during the entirety of the Bournewood-RES

---

[5] Contrast this absence of the element of scienter in § 3730(d)(3) with the requirement that the *defendant* act with scienter for purposes of establishing a violation under § 3729(a).  *See, e.g.*, 31 U.S.C. § 3729(a)(1)(A) ("any person who *knowingly* presents, or causes to be presented, a false or fraudulent claim for payment" is liable under the FCA).  Put differently, when Congress intended to require a showing of scienter under the FCA it stated so explicitly.

relationship, a barred attorney in Massachusetts. Perry was obligated to (and perhaps he did) assess the legality of his contractual relationship with Bournewood before entering into that agreement. At the very least, he was uniquely positioned as a barred attorney to seek legal guidance as to the propriety of the arrangement. Perry should not now be rewarded for exercising, at best, reckless disregard regarding his contractual relationship with Bournewood particularly given the substantial amounts Bournewood paid him and RES.

Should the Court disagree with the United States and find that (a) the government must prove Perry acted with the requisite scienter, and (b) that the governments' proffered evidence above does not support a finding of scienter, then the government respectfully requests that the Court afford it discovery in the form of a deposition, document production requests, and interrogatories, in order for the government to probe Perry's knowledge of wrongfulness of the scheme he engaged in. To date, given the unique posture of this matter, the government has had no occasion to do so; the only information it has comes from what it gleaned from Perry's qui tam filing, or from what it obtained from Bournewood during its investigation.

### B. The Court Should Permit the Parties to Negotiate the Relator's Award After Determining Whether Perry's Relator Award Should be Reduced

As discussed above, this Court should deny Perry's Motion and find that his relator's award should be reduced to zero, or alternatively to an amount below 15%, pursuant to § 3730(d)(3) of the FCA and § 5F(5) of the MFCA. Should the Court disagree, (and if applicable, the Court declines to permit the government discovery regarding Perry's intent), the governments respectfully request that the Court allow the parties thirty (30) days to negotiate the amount of the relator's award in accordance with this Court's ruling. To date, due to the dispute over the application of the "planned or initiated" bar, the parties have not engaged in substantive negotiations regarding the relator's award, beyond simply exchanging their initial positions. If

19

the parties are unable to reach an agreement within that time, the parties will advise the Court and the matter can be set for further adjudication.

## **CONCLUSION**

For the reasons set forth above, the governments respectfully request that the Motion to Determine Relator's Share of Settlement Proceeds be denied and that this Court find that Mr. Perry's relator's award should be reduced to zero, or set at an amount below 15% of the Settlement proceeds, pursuant to 31 U.S.C. § 3730(d)(3) and M.G.L. c. § 5F(5).  If the Court concludes otherwise, the governments further respectfully request that the governments be afforded the opportunity to undertake discovery concerning Perry's intent, and/or the parties be given 30 days to negotiate the amount of the relator's award consistent with this Court's ruling.

Respectfully submitted,

| | |
|---|---|
| JOSHUA S. LEVY<br>United States Attorney | ANDREA JOY CAMPBELL<br>Attorney General |
| | |
| */s/ Steven T. Sharobem*<br>STEVEN T. SHAROBEM<br>GREGORY J. DORCHAK<br>ANUJ KHETARPAL<br>JULIEN M. MUNDELE<br>Assistant United States Attorneys<br>United States Attorney's Office<br>One Courthouse Way, Suite 9200<br>Boston, MA 02210<br>Phone: (617) 748-3100<br>steven.sharobem@usdoj.gov<br>gregory.dorchak@usdoj.gov<br>anuj.khetarpal@usdoj.gov<br>Julien.mundele@usdoj.gov | */s/ Katie Cooper Davis*<br>KATIE COOPER DAVIS<br>(BBO# 694251)<br>Assistant Attorney General<br>Commonwealth of Massachusetts<br>Office of the Attorney General<br>One Ashburton Place, 18th Floor<br>Boston, MA 02110<br>Phone: (617) 963-2498<br>Fax: (617) 573-5367<br>katie.davis@mass.gov |

Dated: December 2, 2024