UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA and the COMMONWEALTH OF MASSACHUSETTS *ex rel.* DAVID PERRY, <br><br> Plaintiffs, <br><br> v. <br><br> FIRST PSYCHIATRIC PLANNERS, INC. d/b/a BOURNEWOOD HEALTH SYSTEMS and BOURNEWOOD HOSPITAL, <br><br> Defendant. | No. 21-cv-11483-WGY |

## AMENDED STIPULATION OF FACTS

A separate Appendix to this Amended Stipulation of Facts, with Attachments A through L is being filed separately.

1. Between July 1, 2008, and June 2018, the relator, David Perry, was the sole owner and director of Recovery Educational Services, Inc. ("RES"), a sober home community in Roxbury, MA. Mr. Perry incorporated RES in the Commonwealth of Massachusetts on November 30, 2007.

2. Mr. Perry was also a barred and licensed attorney in the Commonwealth of Massachusetts between October 2014 and December 2019. The Massachusetts Board of Bar Overseers previously suspended him from the practice of law from January 2005 until his reinstatement in October 2014.

3. During approximately 2013-2015, RES managed eight sober houses in Roxbury, MA, that could house up to 96 men and women at any time.

4. RES closed in 2019.

5. Beginning in February 2009 and until June 2018, RES contracted with Bournewood Health Systems ("Bournewood") to provide sober housing to Bournewood's partial hospital program ("PHP") patients.

6. Bournewood's PHP is an intensive outpatient therapy program for patients who need substance use treatment and mental health services. The PHP is a "step down" program from inpatient hospitalization at a detoxification facility. The PHP offers a way for patients to re-integrate back into the community while continuing to receive significant substance use and mental health treatment. During the relevant period, Bournewood's

PHP operated from 9 am to 3 pm each day, excluding weekends and holidays. Patients were typically enrolled in Bournewood's PHP between two to four weeks but could receive treatment for longer as their needs required.

7. Prior to 2007, Bournewood experienced difficulties with getting substance use recovery patients to attend the Brookline PHP regularly and on-time.

8. To attempt to address the situation, Bournewood initially paid and provided substance use recovery patients with Massachusetts Bay Transportation Authority ("MBTA") subway passes and taxi vouchers in the hopes that defraying the cost of travel would increase the daily census of the PHP.

9. In or around July 2003, Bournewood entered into a one-year affiliation agreement with a sober home, Twelve Step Education Program of New England ("Twelve Step"). Attached hereto as Exhibit A is a true and accurate copy of the Twelve Step affiliation agreement.

10. In the affiliation agreement with Twelve Step, Bournewood agreed to "purchase 2 sober beds" on the second floor of a sober home operated by Twelve Step at 171 Old Cambridge Road in Woburn, MA at the current resident rate of $18.60 per day. If one of the beds the Bournewood "purchased" was occupied by a substance use recovery patient not enrolled in Bournewood's PHP, Twelve Step was required to credit the daily rate back to Bournewood. Bournewood also agreed to transport patients to and from the defendant's PHP and Twelve Steps daily. In exchange, Twelve Step agreed to provide lunch at Bournewood's Woburn PHP to Twelve Step and non-Twelve Step substance use recovery patients attending the defendant's PHP. One year later, Bournewood and Twelve Step entered into a new affiliation agreement effective July1, 2004, that removed the provision regarding the purchase of beds but retained the transportation and lunch provisions.

11. On or about October 11, 2007, Bournewood and New England Transitions ("NET"), a Medford-based sober home, entered into an affiliation agreement in which Bournewood agreed to "reimburse [NET] $560.00 per bed per month (4 weeks) for two [NET] sober beds available to clients referred by Bournewood's clinical staff" and "[r]eimburse [NET] a per diem rate of $20.00 for additional clients in need of such services when the two Bournewood beds are occupied." NET agreed to "[m]aintain the expectation that clients in Bournewood's designated beds regularly attend Bournewood's [PHP]" and provide Bournewood with a "monthly invoice for charges plus number of days each Bournewood client occupied a designated sober bed." Attached hereto as Exhibit B is a true and accurate copy of the affiliation agreement.

12. On or about February 3, 2009, Bournewood entered into an affiliation agreement with New Horizon House sober home ("New Horizon"), which had a principal address in Quincy, but sober homes located throughout Massachusetts. Carl Smith owned and operated New Horizon. Attached hereto as Exhibit C is a true and accurate copy of the affiliation agreement.

13. According to the terms of the affiliation agreement, Bournewood agreed to pay "$560 per bed per month (4 weeks) for two [New Horizon] sober beds available to clients referred by Bournewood's clinical staff" and "a per diem rate of $20 for additional clients in need of such services when the two Bournewood beds are occupied." New Horizon agreed to "[m]aintain the expectation that clients in Bournewood's designated beds regularly attended Bournewood's [PHP]."

14. In February 2009, executives from First Psychiatric Planners, Inc. d/b/a Bournewood Hospital ("Bournewood") contacted Mr. Perry to discuss Bournewood's need for sober housing. The executives were Jenny Raffa, then Bournewood's Director of Social Services and Ambulatory Care, and Jim Curran, Bournewood's Director of Admissions and Community Relations. Ms. Raffa and Mr. Curran told Mr. Perry that Bournewood was interested in utilizing RES to house patients enrolled in and attending its PHP.

15. Shortly after, Mr. Perry met with Ms. Raffa and Mr. Curran at Bournewood, at their invitation, to continue discussing Bournewood's interest in utilizing RES. After this initial meeting, Mr. Perry also met with Ray Robinson, then Bournewood's President.

16. During the meeting Ms. Raffa, Mr. Curran, and Mr. Robinson ("Bournewood's executives") told Mr. Perry that Bournewood had contracted with two other sober homes, New England Transitions and New Horizons, to house patients attending Bournewood's PHP program. However, the Bournewood executives explained that Bournewood had difficulties getting Intensive Outpatient Therapy ("IOP") patients, encompassing PHP patients, that Bournewood housed at New England Transitions in Malden, MA and New Horizons in Quincy, MA to Bournewood's IOP on a daily basis. At the time, Bournewood, which lacked vehicle transport, gave IOP patients pre-paid subway and bus passes and taxicab vouchers to travel from New England Transitions and New Horizons to Bournewood and back each day.

17. The commute, which lasted an hour or more, resulted in IOP patients ceasing to come to Bournewood's IOP out of frustration with the length of the commute or arriving late. Mr. Robinson specifically expressed frustration to Mr. Perry that Bournewood was losing IOP patients due to these transportation challenges with New England Transitions and New Horizons.

18. Bournewood executives told Mr. Perry that they believed RES could be a potential solution. RES, located in Roxbury, was approximately five miles from Bournewood and thus much closer to Bournewood then New England Transitions and New Horizons.

19. At the same meeting, Bournewood executives extended a contract to RES. Mr. Perry verbally agreed and Bournewood housed its first IOP patient with RES in February 2009.

20. Bournewood and RES subsequently memorialized their affiliation agreement on or around June 12, 2009 ("June 12, 2009, agreement"). The June 12, 2009, agreement provided that Bournewood would pay RES $720 to rent two beds per month to house

Bournewood's IOP patients. Bournewood further agreed to pay RES $24 per day, including weekends and holidays, for any additional beds utilized by Bournewood. Attached hereto as Exhibit D is a true and accurate copy of the affiliation agreement.

21. Initially, Bournewood verbally agreed to transport its IOP patients housed at RES to and from Bournewood and RES each weekday. But the June 12, 2009, agreement stated that RES was responsible for "provid[ing] transportation to Bournewood's PHP daily . . . [and] Bournewood would transport clients back to [RES]."

22. Despite the transportation provision in the June 12, 2009 agreement, Bournewood conducted afternoon pick up and drop off from Bournewood to RES each day, with RES providing such transportation on an "as needed basis."

23. Further in the June 12, 2009 agreement, Bournewood and RES mutually agreed that "That responsibility for the coordination of this affiliation rests with the respective directors of the affiliating parties."

24. Mr. Perry signed the June 12, 2009 agreement on or about June 16, 2009 as RES' "Director of Services."

25. In and around 2011, Mr. Perry met with Ms. Raffa and Mr. Curran again. During this meeting, Ms. Raffa and Mr. Curran requested that RES become more involved in transporting Bournewood's PHP patients to and from RES and Bournewood each day.

26. Mr. Perry agreed, utilizing his own vehicles to facilitate the transport. He sent vehicles from RES to Bournewood three times a day: at 9 am for the start of IOP services; at Noon for IOP patients only attending half days; and at 3 pm for end of day pick up.

27. In 2013, a hand-written note was added to the June 12, 2009 agreement, increasing the daily rate per bed utilized by all of the Bournewood's patients housed at RES to $30 from $24.

28. Mr. Perry advocated for the increase in the daily rate per bed from $24 to $30 from Bournewood because he was providing Bournewood PHP patients with needed services. Mr. Perry recalls that Mr. Curran of Bournewood suggested that he advocate for the increase in the daily rate.

29. As of 2013, the $30 daily rate per bed exceeded RES' rate for self-paying residents.

30. In mid-2014, Bournewood executives contacted Mr. Perry and requested that RES take over the responsibility of transporting all IOP patients from RES to Bournewood. Subsequently, Bournewood requested that RES pick up new patients from an estimated 30 referring treatment facilities located as far south as Fall River, as far north as Lowell and Methuen, and as far west as Worcester and Georgetown, MA. RES brought Bournewood's patients to RES in the afternoon and evening before the patients began

4

their treatment at Bournewood's IOP the next morning.

31. At the request of Bournewood, Mr. Perry personally picked up many new Bournewood IOP patients from the outside referring treatment facilities and programs.

32. For patients receiving a daily dose of methadone, RES agreed to Bournewood's request to transport patients to and from a methadone clinic each morning before 9 am before being transported to Bournewood.

33. On or around September 1, 2016, Bournewood and RES entered into a new affiliation agreement ("September 1, 2016, agreement"). Attached hereto as Exhibit E is a true and accurate copy of the September 1, 2016 agreement.

34. Bournewood informed RES in August 2016 that Bournewood would be downsizing its transportation fleet and asked RES to take over complete responsibility of transporting patients to and from RES and Bournewood.

35. The September 1, 2016, agreement restated the provisions in the June 12, 2009, agreement including Bournewood's agreement to reimburse RES $30 per night per patient Bournewood housed at RES and RES's responsibility to transport patients from Bournewood each day.

36. Both the June 12, 2009 agreement and the September 1, 2016 agreement contained a requirement that RES "maintain expectation that clients in Bournewood's designated beds regularly attend Bournewood's [PHP]."

37. The September 1, 2016, agreement also provided that "the responsibility for the coordination of this affiliation rests with the respective directors of the affiliating parties."

38. Mr. Perry signed the September 1, 2016, agreement on or about September 22, 2016, as RES' "Director of Services."

39. On or around April 12, 2017, RES' director, Nick Lukasiak, had a meeting with Mona Bastide, then Bournewood's Director of Social Services and Ambulatory Care, and Mr. Curran. RES presented Bastide and Curran with a "'Memorandum of Services' provided exclusively to the patients of the intense (sic) out-patient day program Bournewood Hospital Chjestnut (sic) Hioll (sic) location" at the meeting. The memorandum, from Mr. Perry and Mr. Lukasiak, set out the "services provided to patients of the Bournewood Out-Patient Day program while in residence at [RES]." Mr. Perry delineated that RES provided Bournewood's PHP patients housed at RES the following services:

   a. "Transportation To/From Bournewood Hospital"

   b. "Transportation of New Referral Patients to RES from Outside 'Referring Treatment Facilities'"

5

    c. "Transportation of Current Patients to 'Outside Medical Appointments' & 'Placement Interviews' at Halfway Houses, Holdings[,] and Work Programs"

    d. "Transportation of Graduated Patients to 'After Care Facilities' (As Needed) to Facilitate the Realization of the After Care Plan"

    e. "Transportation of Current Patients to Local Methadone Clinics"

    f. "Daily Reporting of Attendance Census/Behavioral Issues"

    g. "Urine Testing"

    h. "Bedding Upon Entry"

    i. "'<u>Welcome Gift Bag</u>' for All New Bournewood Patients Arriving to RES" including "food; soap and toothpaste; toilet paper; bowls, cups, plasticware; snack crackers, candy."

40. Mr. Perry learned that between 2009 and 2018, Bournewood contracted with at least five other sober homes to house Bournewood's PHP patients. It was his understanding, however, that RES was the "primary sober house" Bournewood used and that RES "always remained the principle sober house utilized by Bournewood to house the majority of its [PHP] population" during those years.

41. Over time the relationship grew, to a point where, Mr. Perry "remained in close contact with seemingly every staff member working at the Bournewood IOP." Mr. Perry "made certain that [he] was always responsive to the IOP's need and/or requirement asked me of during the entire term" of RES' relationship with Bournewood. He "regularly communicated 3-4 times daily with Scott Deagle [Bournewood's Lead Intake Coordinator]." Because Mr. Perry was often person transporting patients to and from RES and Bournewood, he "had the opportunity to meet with [Mr.] Deagle in person every morning and every afternoon to discuss the IOP's new or discharged patients." Mr. Perry was often "approached by several of the IOP clinicians and social workers to answer questions regarding how their patients were doing at RES during the previous 18 hours that their patients were not receiving treatment."

42. Between February 2009 and June 2018, Mr. Perry estimated that Bournewood housed 3,000 or more patients at RES.

43. Bournewood made monthly payments to RES for housing PHP patients. Mr. Perry deposited these sums in RES bank accounts. Below are payments RES received from Bournewood between January 2015 and July 2018 totaling $474,440.

    Jan. 9, 2015 - $ 10,800
    Feb. 6, 2015 - $ 15,390
    Mar. 6, 2015 - $ 16,770

Apr. 10, 2015 - $ 13,340
May. 1, 2016 - $ 10,110
Jun. 11, 2015 - $ 11,400
Jul. 9, 2015 - $ 11,280
Aug. 7, 2015 -$ 15,660
Sep. 2, 2015 - $ 9,240
Oct. 16, 2015 - $ 11,100
Nov. 13, 2015 - $ 13,890
Jan. 8, 2016 - $ 15,750
Feb. 5, 2016 - $ 10,000
Mar. 4, 2016 - $ 12,330
Apr. 1, 2016 - $ 12,870
May. 13, 2016 - $ 13,410
Jun. 10, 2016 - $ 16,140
Jul. 8, 2016 - $ 17,100
Aug. 8, 2016 - $ 16,740
Sep. 2, 2016 - $ 11,370
Oct. 14, 2016 - $ 12,960
Nov. 16, 2016 - $ 16,110
Dec. 15, 2016 - $ 6,000
Jan. 9, 2017 - $ 16,980
Mar. 8, 2017 - $ 4,000
Apr. 18, 2017 - $ 15,900
May 15, 2017 - $ 15,930
Jun. 15, 2017 - $ 14,190
Jul. 11, 2017 - $ 15,500
Aug. 20, 2017 - $ 5,000
Sep. 5, 2017 - $ 13,860
Oct. 13, 2017 - $ 11,100
Nov. 10, 2017 - $ 13,710
Dec. 15, 2017 - $ 10,200
Jan. 22, 2018 - $ 16,940
Feb. 5, 2018 - $ 7,000
Mar. 12, 2018 - $ 5,000
Apr. 4, 2018 - $ 1,600
May 7, 2018 - $ 1,600
June 4, 2018 - $ 4,900
July 16, 2018 - $ 1,300

44. On numerous occasions, self-paying RES residents who were struggling financially to pay the $160 weekly rent to stay at RES, approached Mr. Perry about attending Bournewood's IOP program so that Bournewood would pay their rent. On some of those occasions, Mr. Perry contacted Mr. Deagle to relay the message that "John Doe" a resident at RES, was interested in attending the Bournewood IOP.

45. Following instructions from Mr. Deagle, Mr. Perry would conduct a urine drug test on prospective new patients of Bournewood and transport them to Bournewood the next morning or to a hospital for medical clearance, as directed by Mr. Deagle. Mr. Perry had no ability or authority to admit a patient to Bournewood's IOP or PHP program.

46. Bournewood, via Mr. Curran, paid RES monthly by check. Bournewood would know how much to pay RES based upon Bournewood's records, although Mr. Perry provided handwritten "Bournewood Rent Charts" on a monthly basis that identified the Bournewood patient residing at RES that month and the days they resided at RES while attending Bournewood. Generally, Mr. Perry picked up the monthly check at Bournewood and deposited the monies into one of three Citizens Bank accounts for RES of which Mr. Perry was the sole signatory.

47. As part of RES' intake process, RES forms included sections for demographics and insurance information to be completed by residents.

48. Mr. Perry, as RES' Director, knew that "a large portion of Bournewood's patients had medical insurance with MassHealth or Medicare."

49. Neither David Perry, nor RES, entered into any Medicare or Masshealth payment or provider agreements.

50. Sometime during 2016, Bournewood executives told Mr. Perry that if a patient arrived at Bournewood anytime after 10:30 am, Bournewood would only be able to charge the insurance company for a half-day of treatment.

51. Mr. Perry learned that when a patient's treatment ended at Bournewood, for whatever reason, Bournewood would stop paying to house the patient at RES. Mr. Perry knew that most patients were typically left with no other housing options. Some discharged patients would stay at RES on a self-pay basis, but many were required to leave RES and take up residence at shelters and other transitional housing settings.

52. David Perry did not participate in billing the government for any services rendered by Bournewood to its patients, at any point time.

53. Between 2007 and 2022, Bournewood entered into agreements with eight other sober homes. Though the length and details differ slightly with each agreement all of the contracts followed a similar general construct to the one Bournewood entered into with RES.

54. Steps to Solutions is a sober home based in Dorchester, owned and operated by Peter McCarthy. Between September 2013 and March 2022, Bournewood paid to house 487 substance use recovery patients covered by federal healthcare programs at Steps to Solutions.

55. On or about December 1, 2016, Bournewood entered into an agreement with Milton Management, LLC, otherwise known as Faith House, which operated a series of sober homes in Dorchester, Roxbury, and Quincy. Faith House is owned and operated by Joseph Pizziferri. Under the terms of the agreement, Bournewood agreed to pay Faith House a per diem rate of $30 for substance use recovery patients housed at Faith House. Faith House agreed to "[m]aintain the expectation that clients in Bournewood's designated beds regularly attend" Bournewood's PHP. Attached hereto as Exhibit F is a true and accurate copy of that agreement.

56. On January 31, 2018, Bournewood entered into a "Sober Living Agreement" with Solutions Group, Inc. ("Solutions"), a sober home in Dorchester operated by Thomas Lyons. Under the terms of the Sober Living Agreement, Bournewood agreed to pay Solutions a one-time administrative fee per qualifying patient of $100, and a rate of $25.80 per patient per night housed at Solutions. Unlike prior agreements with sober homes, this agreement contained a provision requiring a patient to qualify for free sober housing by evidencing indigency. Attached hereto as Exhibit G is a true and accurate copy of that Sober Living Agreement with Solutions.

57. On or about June 1, 2018, Bournewood entered into a Sober Living Agreement with Angelos Development, LLC ("Angelos"), a sober home located in Medfield, and owned and operated by Boris Krants. Under the terms of the Sober Living Agreement, Bournewood agreed to pay Angelos a one-time administrative fee of $100 for each patient and a daily rate of $29.57 per qualifying patient per night per bed. A qualifying patient needed to meet income requirements and "elect to live at a residence of [Angelos] while participating" in Bournewood's PHP. Attached hereto as Exhibit H is a true and accurate copy of that Sober Living Agreement with Angelos.

58. On or about August 1, 2018, Bournewood entered into a Sober Living Agreement with North East Special Needs Housing, LLC ("NESNH"), a sober home located in Dorchester, owned and operated by Michael D. Jordan. According to the terms of the agreement, Bournewood agreed to pay the rent for qualifying substance use recovery patients enrolled in and attending their PHP. A qualifying patient needed to meet income requirements and "elect to live at [NESNH]" while participating in Bournewood PHP. Unlike prior agreements with sober homes, however, Bournewood agreed to pay NESNH $900 a month for 6 exclusive beds for a monthly total of $5,400. Bournewood agreed to pay NESNH in bi-monthly installments of $2,700. Attached hereto as Exhibit I is a true and accurate copy of that Sober Living Agreement with NESNH.

59. On or about October 26, 2018, Bournewood entered into a Sober Living Agreement with A Vision from God, LLC, a sober home referred to as Brady's Place then based at 250 Seaver Street in Boston. The sober home, which relocated to Weymouth, is owned and operated by Daniel Cleggett. Per the terms of the Sober Living Agreement, Bournewood agreed to pay $900 per month per bed for 24 beds for the exclusive use by Bournewood's male PHP substance use recovery patients beginning on November 1, 2018, and $900 per month per bed for an additional 6 beds for the exclusive use by the

defendant's female PHP substance use recovery patients beginning on December 1, 2018. Bournewood further agreed to pay an administrative fee of $75 per patient that resided in the sober home for more than 24 hours. Attached hereto as Exhibit J is a true and accurate copy of that Sober Living Agreement with a Vision from God.

60. Bournewood routinely contacted referring facilities about their PHP and advertised their offer of free sober housing. Bournewood's Lead Intake Coordinator for Outpatient Services ("Lead Intake Coordinator") regularly communicated with referring facilities' social workers about the defendant's PHP and offer of free sober housing.

61. Some substance use recovery patients who enrolled in and attended the Bournewood's PHP learned of Bournewood's offer of free sober housing from other patients and sober home operators and expressly sought out the free sober housing without referral from a referral facility.

62. After referral, Bournewood evaluated the substance use recovery patient for admission to the Bournewood's PHP. Bournewood also evaluated the patient for free sober housing if they requested it.

63. Between May 2007 and December 2017, Bournewood's provision of free sober housing was governed by an internal policy entitled the "Sober Bed Free Care Policy." The policy was revised in July 2009, July 2011, and June 2014. Attached hereto as Exhibit K is a true and accurate copy of that Sober Bed Free Care Policy.

64. Bournewood required substance use recovery patients receiving free sober housing to sign a "Partial Hospital Program with Sober House Agreement" ("PHP Sober House Agreement"). Attached hereto as Exhibit L is a true and accurate copy of that PHP Sober House Agreement. Bournewood also requested that patients initial certain statements in the PHP Sober House Agreement including, most relevantly:

   a. "I understand that if admitted to Bournewood Health Systems PHP, it is expected that I will attend programing Monday through Friday between 9am-2pm. Attendance is expected, and unexcused absences typically result in administrative discharge from the program."

   b. "I understand that the average length of stay in PHP is about 2 weeks."

   c. "I understand that the cost of the sober house bed will only be covered by [the defendant] as long as I am admitted to the PHP program. If I choose to stay in the sober house after discharge from the PHP, I am responsible for the daily/weekly cost of the bed."

65. Bournewood ended its relationship with Mr. Perry on or about March 2018.

66. On February 12, 2018, the Commonwealth of Massachusetts indicted Mr. Perry on two counts.  Specifically, the indictments alleged that:

    a. On November 14, 2017, Mr. Perry did knowingly or intentionally manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance in Class B in violation of Mass. Gen. Laws c. 94C, § 32A(a).

    b. On an unknown date, but occurring in 2017 through November 14, 2017, Mr. Perry conspired with other(s) to distribute a Class B drug to violate Mass. Gen. Laws. 94C, §32A(a), in violation of Mass. Gen. Laws c. 94C, § 40.

67. On May 4, 2018, the Commonwealth of Massachusetts indicted Mr. Perry on 34 counts. This included:

    a. Seven counts for Conspiracy to Distribute a Class B/E drug to violate Mass. Gen. Laws c. 94C, § 32A(a), in violation of Mass. Gen. Laws c. 94C, § 40 on divers dates between 2016 and 2017;

    b. Two counts of Possession of Controlled Substances Class B in violation of Mass. Gen. Laws c. 94C, § 34;

    c. One Count of Possession of Controlled Substances Class C in violation of Mass. Gen. Laws c. 94C, § 34;

    d. Three counts of Possession of Controlled Substances Class E in violation of Mass. Gen. Laws c. 94C, § 34;

    e. Six counts for Sexual Conduct for a Fee in violation of Mass. Gen Laws c. 272, § 53A(b) on divers dates in 2012, 2013, 2014, 2016, 2017; and

    f. 15 counts for Tampering with Record or Other Object for Use in Official Proceeding in violation of Mass. Gen. Laws c. 268, § 13E at divers dates between 2012 and 2017.

68. On or around October 2. 2019, Mr. Perry pled guilty to all 36 counts.

69. The six (6) counts for Possession of Controlled substances relate to drugs found at David Perry's home in Reading, MA on November 14, 2017 and not at RES in Roxbury.

70. The Government asserts that Robert V., began residing at RES on or around December 27, 2016, in conjunction with his admission to Bournewood's PHP.  Bournewood paid RES to house Robert V. until January 27, 2017.  On or around October 2, 2019, Mr. Perry pled guilty to one count of conspiring to distribute drugs (Class C) with Robert V. on divers dates occurring in 2017 through November 14, 2017.  He also pled guilty to four counts of altering, destroying, mutilating, or concealing records, or attempting to alter,

11

destroy, mutilate, or conceal records regarding Robert V. on divers dates in 2017 through May 9-10, 2017; 2017 through March 21, 2017; 2016 through January 5, 2017; and 2017 through February 14-15, 2017.

71. The six (6) counts for Sexual Conduct for a Fee involve three (3) individuals. These charges relate to conduct occurring in Reading, MA and not at RES. Justin K. was a resident of RES two (2) years prior to the date of the crimes charged. Mark D. was never a resident of RES or patient of Bournewood.

72. Devin H. began residing at RES on or around January 13, 2011, in conjunction with his admission to Bournewood's PHP. Bournewood paid RES to house Devin H. until January 20, 2011. Mr. Perry recalls that Devan H. had a 10 year relationship with Mr. Perry. Devan H. was a patient of Bournewood for six (6) days during 2011 and a resident of RES for eleven (11) days during 2011. David Perry was not charged or convicted of any crimes occurring during 2011. On or around October 2, 2019, Mr. Perry pled guilty to three counts of paying, agreeing to pay, or offering to pay Devin H. to engage in sexual conduct on divers dates between June 1, 2012 and June 1, 2013; January 1, 2014 and April 1, 2014; and November 14, 2017.

73. Mr. Perry recalls that the fifteen (15) counts for Tampering with Records concern letters sent to RES residents' probation officers that were allegedly inaccurate. He further recalls that the allegation was that the letters failed to portray the residents' sobriety efforts and the actual length of time they remained clean. These letters were not shared with Bournewood, nor did Bournewood have any part in writing the letters. All fifteen (15) counts concerned three (3) individuals: Justin K., Derek B. and Robert V. Justin K. was never a patient of Bournewood. Derek B. was never a patient of Bournewood.

74. Jacob R began residing at RES on or around September 27, 2016, in conjunction with his admission to Bournewood's PHP. Bournewood paid RES to house Jacob R. until October 3, 2016. On or around October 2, 2019, Mr. Perry pled guilty to one count of conspiring to distribute drugs (Class B) with Jacob R. on divers dates occurring in 2017 through November 14, 2017. On or around October 2, 2019, Mr. Perry pled guilty to one count of conspiring to distribute drugs (Class B) with Jacob R. on divers dates occurring in 2017 through November 14, 2017.

75. Only one (1) of the counts for which David Perry pled guilty concerned an active Bournewood patient (Robert V.). The charge related to David Perry writing an inaccurate letter to Robert V.'s probation officer in Salem District Court.

76. David Perry has not been charged with, or sued for, any violation of the FCA, MFCA, or MMFCA, in conjunction with Bournewood's provision of free sober housing to patients to induce their enrollment and attendance in Bournewood's PHP.

**Procedural Facts**

77. On or around September 10, 2021, Mr. Perry filed a qui tam complaint in the United States District Court in the District of Massachusetts against Bournewood, Inc. doing business as Bournewood Health Systems and First Psychiatric Planners, Inc. ("Bournewood").

78. Mr. Perry's qui tam complaint alleged that Bournewood violated the federal False Claims Act ("FCA"), *see* 31 U.S.C. § 3729 *et seq.*, and the Massachusetts False Claims Act ("MFCA"), *see* Mass. Gen. Laws c. 12, §5A-O, by paying kickbacks in the form of free sober housing to substance use disorder patients to induce their enrollment and attendance in Bournewood's IOP. The complaint further alleged that Bournewood billed and received reimbursement from federally funded healthcare programs including Medicare and Massachusetts Medicaid ("MassHealth") for the services rendered to the patients induced to enroll in and attend Bournewood's IOP.

79. Mr. Perry served his qui tam complaint on the United States Attorney's Office and the Massachusetts Attorney General's Office on or around September 15, 2021, in accordance with the requirements of the FCA, *see* 31 U.S.C. § 3730(b)(2), and the MFCA, *see* Mass. Gen. Laws c. 12, § 5C(3).

80. In addition, and in compliance with the FCA, *see* 31 U.S.C. § 3730(b)(2), and the MFCA, *see* Mass. Gen. Laws c. 12, § 5C(3), Mr. Perry provided written disclosures and material evidence to the United States Attorney's Office and the Massachusetts Attorney General's Office in support of his allegations against Bournewood in his qui tam complaint.

81. On or about September 15, 2021, and in support of his qui tam complaint, Mr. Perry produced a six-page document to the United States Attorney's Office and the Massachusetts Attorney General's Office entitled "Written Disclosure by David Perry re: Bournewood Hospital" which detailed his interactions with Bournewood. Additionally, Mr. Perry also produced (1) the "'Memorandum of Services' Provided Exclusively to the Patients of the Intense (sic) Out-patient Day Program Bournewood Hospital Chjestnut (sic) Hioll (sic) Location" given by RES to Mona Bastide, Bournewood's Director of Social Services and Ambulatory Care on or around April 12, 2017; (2) a 2013 1099-MISC from Bournewood to RES; and (3) a 2015 1099-MISC from Bournewood to RES.

82. On or about October 8, 2021, Mr. Perry produced a three-page document to the United States Attorney's Office and the Massachusetts Attorney General's Office entitled "First Supplemental Written Disclosure by David Perry re: Bournewood Hospital" which provided further detail of his interactions with Bournewood and a generalized summary of his discussions with three prior Bournewood IOP patients who resided at RES.

83. On or about October 18, 2021, in response to requests made by the United States Attorney's Office and the Massachusetts Attorney General's Office for Mr. Perry's financial records related to Bournewood's payments to RES and additional documentation retained by Mr. Perry regarding the Bournewood patients who resided at

13

RES, Mr. Perry produced:

    a. A three-page document entitled "Second Supplemental Written Disclosure by David Perry (Bournewood Hospital)" which provided information about the checks RES received and deposited from Bournewood from January 2015 through July 2018;

    b. A five-page document entitled "Third Supplemental Written Disclosure by David Perry" which provided additional information regarding his interactions with Bournewood and with self-paying RES residents who sought enrollment in Bournewood's PHP in order to obtain free sober housing;

    c. Monthly Citizens Bank statements for an RES checking account showing deposits from Bournewood between January 2015 and July 2018;

    d. Bournewood Rent Charts retained by Mr. Perry for 2016 and 2017; and

    e. An exemplar release and referral form related to a Bournewood IOP patient who resided at RES on or around May 2012.

84. On October 25, 2021, the United States Attorney's Office and the Massachusetts Attorney General's Office interviewed Mr. Perry to inquire into his allegations against Bournewood.

85. On or about October 26, 2021, Mr. Perry produced, at the request of the United States Attorney's Office and the Massachusetts Attorney General's Office, a picture of a bank check from Bournewood to RES dated February 1, 2018.

86. On or about November 10, 2021, Mr. Perry produced, at the request of the United States Attorney's Office and the Massachusetts Attorney General's Office, the following:

    a. 2012, 2013, and 2014 Citizen Bank monthly statements showing the amount Bournewood paid RES in rent each month;

    b. 21 checks RES received from Bournewood between January 2016 and February 2018;

    c. "Seating Charts" retained by RES on various dates between 2011 and 2017 identifying the residents of RES including Bournewood PHP patients; and

    d. A nine-page document entitled "Supplemental Disclosure of David Perry dated November 10, 2021, Perry's Response to Government's Specific Inquiries of October 26, 2021" providing information related to Bournewood's monthly payments to RES and the number of patients housed by RES per month; and the names and contact information, if known, of particular persons he spoke with at Bournewood and at referring facilities regarding Bournewood's offer to pay for

14

        IOP patients sober housing.

87. On March 22, 2023, the United States and the Commonwealth of Massachusetts filed a notice of intervention in Mr. Perry's qui tam.

88. On September 15, 2023, the United States and the Commonwealth of Massachusetts filed a Complaint-In-Intervention against Bournewood.

89. On October 2, 2023, the United States and the Commonwealth of Massachusetts filed an Amended Complaint-In-Intervention.

90. On December 1, 2023, Bournewood filed a Motion to Dismiss for Failure to State a Claim ("Motion to Dismiss") against the Amended Complaint-In-Intervention filed by the United States and the Commonwealth of Massachusetts.

91. On December 22, 2023, the United States and the Commonwealth of Massachusetts filed a Joint Opposition to Bournewood's Motion to Dismiss.

92. On January 16, 2024, Bournewood filed a reply brief in support of its Motion to Dismiss.

93. On January 8, 2024, the United States and the Commonwealth of Massachusetts filed a sur-reply in support of their Joint Opposition to Bournewood's Motion to Dismiss.

94. On February 12, 2024, the Court held a hearing on Bournewood's Motion to Dismiss. The Court denied Bournewood's motion except as to one count.

95. On February 27, 2024, the United States, the Commonwealth of Massachusetts, and Bournewood submitted a Joint Submission pursuant to Local Rule 16.1.

96. On September 30, 2024, the United States, the Commonwealth of Massachusetts, Bournewood, and Mr. Perry entered into a settlement resolving all allegations against Bournewood.

97. On October 4, 2024, the United States, the Commonwealth of Massachusetts, and Mr. Perry filed a Notice of Stipulation of Partial Dismissal, advising of the settlement with Bournewood. The Notice also indicated that Mr. Perry was reserving his right to litigate the relator's award of the settlement recovery because Mr. Perry, the United States, and the Commonwealth of Massachusetts were unable to come to an agreement on the matter.

98. On November 8, 2024, Mr. Perry filed a Motion to Determine Relators Share of Settlement Proceeds.

99. On December 2, 2024, the United States and the Commonwealth of Massachusetts filed a Joint Opposition to Mr. Perry's Motion to Determine Relators Share of Settlement Proceeds.

15

100. On December 9, 2024, Mr. Perry filed a reply brief in support of his Motion to Determine Relators Share of Settlement Proceeds.

101. On December 9, 2024, the Court held a status conference and ordered a further status conference in the matter on January 9, 2025. The Court subsequently reset the status conference to January 16, 2025.

102. On January 16, 2025, the Court held a further status conference. The Court ordered that the United States and Commonwealth of Massachusetts' Joint Opposition to Mr. Perry's Motion to Determine Relators Share of Settlement Proceeds should be treated as a Motion to Dismiss. The Court also granted the United States and Commonwealth of Massachusetts 30 days to file a Supplemental Opposition to Mr. Perry's Motion to Determine Relators Share of Settlement Proceeds.

103. On February 18, 2025, the United States and the Commonwealth of Massachusetts filed a Supplemental Joint Motion to Dismiss Mr. Perry's Motion to Determine Relators Share of Settlement Proceeds.

104. On March 5, 2025, Mr. Perry filed an Opposition to the United States and the Commonwealth of Massachusetts' Supplemental Joint Motion to Dismiss Mr. Perry's Motion to Determine Relators Share of Settlement Proceeds.

105. On March 20, 2025, the Court held a hearing and denied the United States and Commonwealth of Massachusetts' Motion to Dismiss. The Court ordered the parties to file a joint final pre-trial memorandum within 30 days and advised it would be aided by a joint stipulated set of facts. After filing, the Court will promptly schedule an evidentiary hearing. The United States inquired with the Court as to conducting discovery and was advised the parties could work it out, but always have subpoenas.

Dated this 2nd day of June 2025.

Respectfully submitted,

| | |
|---|---|
| LEAH B. FOLEY<br>United States Attorney | ANDREA JOY CAMPBELL<br>Attorney General |
| */s/Steven T. Sharobem*<br>STEVEN T. SHAROBEM<br>GREGORY J. DORCHAK<br>ANUJ KHETARPAL<br>JULIEN M. MUNDELE<br>Assistant United States Attorneys<br>United States Attorney's Office<br>One Courthouse Way, Suite 9200<br>Boston, MA 02210<br>Phone: (617) 748-3100<br>steven.sharobem@usdoj.gov<br>gregory.dorchak@usdoj.gov<br>anuj.khetarpal@usdoj.gov<br>Julien.mundele@usdoj.gov | */s/Katie Cooper Davis*<br>KATIE COOPER DAVIS<br>(BBO# 694251)<br>Assistant Attorney General<br>Commonwealth of Massachusetts<br>Office of the Attorney General<br>One Ashburton Place, 18th Floor<br>Boston, MA 02110<br>Phone: (617) 963-2498<br>Fax: (617) 573-5367<br>katie.davis@mass.gov |

For the Relator,

*/s/Andrew J. Tine* (BBO633639)
Law Offices of Andrew J. Tine
18 Maple Avenue, Suite 267
Barrington, RI 02806
atine@tinelaw.com
401-396-9002 – Tel.

## **CERTIFICATE OF SERVICE**

      I certify that, on June 2, 2025, I served a copy of the foregoing document by electronic mail on the following counsel:

Katie Davis, Esq.
Assistant Attorney General
Office of Attorney General Andrea Campbell One Ashburton Place, 18th Floor
Boston, MA 02110
Phone: (617) 727-2200
katie.davis@state.ma.us

Steven T. Sharobem, Esq.
Gregory J. Dorchak, Esq.
Assistant United States Attorneys
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Phone: (617) 748-3100
steven.sharobem@usdoj.gov
gregory.dorchak@usdoj.gov


      By */s/Andrew J. Tine*