UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and the COMMONWEALTH OF MASSACHUSETTS, ex rel. DAVID PERRY, | ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. |
| v. | ) ) | 21-11483-WGY |
| FIRST PSYCHIATRIC PLANNERS, INC. d/b/a BOURNEWOOD HEALTH SYSTEMS, and BOURNEWOOD HOSPITAL, | ) ) ) ) | |
| Defendants. | ) ) | |

YOUNG, D.J.                                    February 13, 2026

## MEORANDUM AND ORDER

### I.    INTRODUCTION

Relator David Perry's ("Perry") motion against the plaintiffs, the United States of America and the Commonwealth of Massachusetts ("the Governments") for a statutory share of the settlement proceeds obtained in this case, see Relator's Mot. Determine Relator's Share of Settlement Proceeds ("the Motion"), ECF No. 59, is DENIED and, pursuant to 31 U.S.C. § 3730(d)(3), Perry shall take nothing from the settlement and is DISMISSED as a party to this action.

This memorandum explains the Court's reasoning in reaching this determination.

## II.  PROCEDURAL HISTORY[1]

### A.  The Governments' Successful Intervention and Prosecution of the Bournewood Qui Tam Action.

As an initial matter, the Governments' prosecution of this action against Bournewood was successful, resulting in a settlement.

On or around September 10, 2021, Perry filed a qui tam complaint in the United States District Court in the District of Massachusetts against Bournewood, Inc. doing business as Bournewood Health Systems, First Psychiatric Planners, Inc. ("Bournewood").  Stip. ¶ 77, Compl., ECF No. 1.

As set forth below in more detail in the Stipulated Facts, Part III, infra, Perry's qui tam complaint alleged that Bournewood violated the federal False Claims Act ("FCA"), see 31 U.S.C. § 3729 et seq., and the Massachusetts False Claims Act ("MFCA"), see Mass. Gen. Laws ch. 12, § 5A-O, by paying kickbacks in the form of free sober housing to substance use disorder patients to induce their enrollment and attendance in Bournewood's Intensive Outpatient Therapy ("IOP") program.  Stip. ¶ 78.  The complaint further alleged that Bournewood billed and received reimbursement from federally funded

---

[1] The following procedural history is adopted almost verbatim primarily from the parties' Amended Stipulation of Facts, Am. Stip. Facts, ("Stip. ¶ __"), ECF No. 85, where indicated.  Quotations are omitted for readability.

healthcare programs including Medicare and Massachusetts Medicaid ("MassHealth") for the services rendered to the patients induced to enroll in and attend Bournewood's IOP.  Id.

The Governments intervened, and successfully prosecuted the matter, resulting in a settlement resolving all allegations against Bournewood.  Stip. ¶ 96.  Although Perry's organization, Recovery Educational Services, Inc. ("RES"), received substantial payments from Bournewood for its housing patients, Perry was not charged with, or sued for, any violation of the FCA or MFCA in conjunction with Bournewood's provision of free sober housing to patients to induce their enrollment and attendance in Bournewood's Partial Hospital Program ("PHP"). Id. ¶76.

### B.  Procedural History

Perry served his qui tam complaint on the United States Attorney's Office and the Massachusetts Attorney General's Office on or around September 15, 2021, in accordance with the requirements of the FCA, see 31 U.S.C. § 3730(b)(2), and the MFCA, see Mass. Gen. Laws ch. 12, § 5C(3).  Id. ¶ 79.  In addition, and in compliance with the FCA, see 31 U.S.C. § 3730(b)(2), and the MFCA, see Mass. Gen. Laws ch. 12, § 5C(3), Perry provided written disclosures and material evidence to the United States Attorney's Office and the Massachusetts Attorney General's Office in support of his

[3]

allegations against Bournewood in his qui tam complaint. Id. ¶ 80.

On or about September 15, 2021, and in support of his qui tam complaint, Perry produced a six-page document to the United States Attorney's Office and the Massachusetts Attorney General's Office entitled "Written Disclosure by David Perry re: Bournewood Hospital" which detailed his interactions with Bournewood. Id. ¶ 81.

Additionally, Perry also produced (1) the "'Memorandum of Services' Provided Exclusively to the Patients of the Intense (sic) Out-patient Day Program Bournewood Hospital Chestnut (sic) Hioll (sic) Location" given by RES to Mona Bastide ("Bastide"), Bournewood's Director of Social Services and Ambulatory Care on or around April 12, 2017; (2) a 2013 1099-MISC from Bournewood to RES; and (3) a 2015 1099-MISC from Bournewood to RES. Id. On or about October 8, 2021, Perry produced a three-page document to the United States Attorney's Office and the Massachusetts Attorney General's Office entitled "First Supplemental Written Disclosure by David Perry re: Bournewood Hospital" which provided further detail of his interactions with Bournewood and a generalized summary of his discussions with three prior Bournewood IOP patients who resided at RES. Id. ¶ 82.

On or about October 18, 2021, in response to requests made by the United States Attorney's Office and the Massachusetts Attorney General's Office for Perry's financial records related to Bournewood's payments to RES and additional documentation retained by Perry regarding the Bournewood patients who resided at RES, Perry produced:

> a. A three-page document entitled "Second Supplemental Written Disclosure by David Perry (Bournewood Hospital)" which provided information about the checks RES received and deposited from Bournewood from January 2015 through July 2018;

> b. A five-page document entitled "Third Supplemental Written Disclosure by David Perry" which provided additional information regarding his interactions with Bournewood and with self-paying RES residents who sought enrollment in Bournewood's [partial hospital program] PHP in order to obtain free sober housing;

> c. Monthly Citizens Bank statements for an RES checking account showing deposits from Bournewood between January 2015 and July 2018;

> d. Bournewood Rent Charts retained by Perry for 2016 and 2017; and

> e. An exemplar release and referral form related to a Bournewood IOP patient who resided at RES on or around May 2012.

Id. ¶ 83.

On October 25, 2021, the United States Attorney's Office and the Massachusetts Attorney General's Office interviewed Perry to inquire into his allegations against Bournewood. Id. ¶ 84.

On or about October 26, 2021, Perry produced, at the request of the United States Attorney's Office and the Massachusetts Attorney General's Office, a picture of a bank check from Bournewood to RES dated February 1, 2018.  Id. ¶ 85.

On or about November 10, 2021, Perry produced, at the request of the United States Attorney's Office and the Massachusetts Attorney General's Office, the following:

    a. 2012, 2013, and 2014 Citizen Bank monthly statements showing the amount Bournewood paid RES in rent each month;

    b. 21 checks RES received from Bournewood between January 2016 and February 2018;

    c. "Seating Charts" retained by RES on various dates between 2011 and 2017 identifying the residents of RES including Bournewood PHP patients; and

    d. A nine-page document entitled "Supplemental Disclosure of David Perry dated November 10, 2021, Perry's Response to Government's Specific Inquiries of October 26, 2021" providing information related to Bournewood's monthly payments to RES and the number of patients housed by RES per month; and the names and contact information, if known, of particular persons he spoke with at Bournewood and at referring facilities regarding Bournewood's offer to pay for IOP patients sober housing.

Id. ¶ 86.

On March 22, 2023, the United States and the Commonwealth of Massachusetts filed a notice of intervention in Perry's qui tam.  Id. ¶ 87

On September 15, 2023, the United States and the
Commonwealth of Massachusetts filed a Complaint-In-Intervention
against Bournewood.  Id. ¶ 88.

On October 2, 2023, the United States and the Commonwealth
of Massachusetts filed an Amended Complaint-In-Intervention.
Id. ¶ 89.  On December 1, 2023, Bournewood filed a Motion to
Dismiss for Failure to State a Claim ("Motion to Dismiss")
against the Amended Complaint-In-Intervention filed by the
United States and the Commonwealth of Massachusetts.  Id. ¶ 90.

On December 22, 2023, the United States and the
Commonwealth of Massachusetts filed a Joint Opposition to
Bournewood's Motion to Dismiss.  Id. ¶ 91.  On January 16, 2024,
Bournewood filed a reply brief in support of its Motion to
Dismiss.  Id. ¶ 92.  On January 8, 2024, the United States and
the Commonwealth of Massachusetts filed a sur-reply in support
of their Joint Opposition to Bournewood's Motion to Dismiss.
Id. ¶ 93.

On February 12, 2024, the Court held a hearing on
Bournewood's Motion to Dismiss.  Id. ¶ 94; Elec. Clerk's Notes,
ECF No. 57.  The Court denied Bournewood's motion except as to
one count.  Id.  On February 26, 2024, the United States, the
Commonwealth of Massachusetts, and Bournewood submitted a Joint
Submission pursuant to Local Rule 16.1.  Joint Statement, ECF
No. 55.

On September 30, 2024, the United States, the Commonwealth of Massachusetts, Bournewood, and Perry entered into a settlement resolving all allegations against Bournewood. Id. ¶ 96. Thereafter, on October 4, 2024, the United States, the Commonwealth of Massachusetts, and Perry filed a Notice of Stipulation of Partial Dismissal, advising of the settlement with Bournewood. Id. ¶ 97; Joint Stip. Partial Dismissal, ECF No. 58. The Notice also indicated that Perry was reserving his right to litigate the relator's award of the settlement recovery because Perry, the United States, and the Commonwealth of Massachusetts were unable to come to an agreement on the matter. Id.

On November 8, 2024, Perry filed a Motion to Determine Relator's Share of Settlement Proceeds, and a memorandum and supporting affidavit on November 11, 2024. Id. ¶ 98; Motion, ECF No. 59; Relator's Mem. Supp. Mot. Determine Relator's Share Settlement Proceeds ("Perry Mem."), ECF No. 60; Aff. David Perry ("Perry Aff."), ECF No. 61. On December 2, 2024, the United States and the Commonwealth of Massachusetts filed a Joint Opposition to Perry's Motion to Determine Relators Share of Settlement Proceeds. Stip. ¶ 99; Gov'ts.' Opp. Perry's Mot. Determine Relator's Share Settlement Proceeds ("Gov'ts.' Opp."), ECF No. 65.

[8]

On December 9, 2024, Perry filed a reply brief in support of his Motion to Determine Relator's Share of Settlement Proceeds. Stip. ¶ 100; Relator's Reply Supp. Mot. Determine Relator's Share Settlement Proceeds ("Perry Reply"), ECF No. 71. On December 9, 2024, the Court held a status conference and ordered a further status conference on the matter on January 9, 2025. Stip. ¶ 101. The Court subsequently reset the status conference to January 16, 2025. Id.

On January 16, 2025, the Court held a further status conference. Id. ¶ 102. The Court ordered that the United States and Commonwealth of Massachusetts' Joint Opposition to Perry's Motion to Determine Relator's Share of Settlement Proceeds should be treated as a Motion to Dismiss. Id. The Court also granted the United States and Commonwealth of Massachusetts 30 days to file a Supplemental Opposition to Perry's Motion to Determine Relator's Share of Settlement Proceeds. Id.

On February 18, 2025, the United States and the Commonwealth of Massachusetts filed a Supplemental Joint Motion to Dismiss Perry's Motion to Determine Relator's Share of Settlement Proceeds. Id. ¶ 103; Gov'ts.' Suppl. Opp. Dismiss Perry's Mot. Determine Relator's Share Settlement Proceeds, ("Gov'ts.' Suppl."), ECF No. 77.

On March 5, 2025, Perry filed an Opposition to the United States and the Commonwealth of Massachusetts' Supplemental Joint Motion to Dismiss Perry's Motion to Determine Relator's Share of Settlement Proceeds.  Stip. ¶ 104; Relator's Suppl. Resp. Supp. Mot. Determine Relator's Share Settlement Proceeds ("Perry Suppl."), ECF No. 79.

On March 20, 2025, the Court held a hearing and denied the United States and Commonwealth of Massachusetts' Motion to Dismiss.  Stip. ¶ 105; Elec. Clerk's Notes, ECF No. 80.  The Court ordered the parties to file a joint final pre-trial memorandum within 30 days and advised it would be aided by a joint stipulated set of facts.  Id.  After filing, the Court was prompt to schedule an evidentiary hearing.  Id.  The United States inquired as to conducting discovery and was advised the parties could work it out, but always have subpoenas.  Id.

The parties filed a Joint Pretrial Memorandum on June 2, 2025, along with stipulated facts, and an appendix of exhibits. ECF Nos. 83, 85, and 86.

On June 3, 2025, the Court held a pretrial conference. Elec. Clerk's Notes, ECF No. 87.

On July 1, 2025, the Court held an evidentiary hearing and took the matter under advisement.  Elec. Clerk's Notes, ECF No. 88.

### III. STIPULATED FACTS[2]

Between July 1, 2008, and June 2018, Perry was the sole owner and director of RES, a sober home community in Roxbury, MA.  Stip. ¶ 1.  Perry incorporated RES in the Commonwealth of Massachusetts on November 30, 2007.  Id.

Perry was also a barred and licensed attorney in the Commonwealth of Massachusetts between October 2014 and December 2019.  Id. ¶ 2.  The Massachusetts Board of Bar Overseers previously suspended him from the practice of law from January 2005 until his reinstatement in October 2014.  Id.

From approximately 2013-2015, RES managed eight sober houses in Roxbury, MA, that could house up to 96 men and women at any time.  Id. ¶ 3.  RES closed in 2019.  Id. ¶ 4.

Beginning in February 2009 and until June 2018, RES contracted with Bournewood to provide sober housing to Bournewood's PHP patients.  Id. ¶ 5.  Bournewood's PHP is an intensive outpatient therapy program for patients who need substance use treatment and mental health services.  Id. ¶ 6. The PHP is a "step down" program from inpatient hospitalization at a detoxification facility.  Id.  The PHP offers a way for patients to re-integrate back into the community while

---

[2] The following stipulated facts are adopted almost verbatim from the parties' Amended Stipulation of Facts.  Quotations are omitted for readability.

continuing to receive significant substance use and mental health treatment.  Id.  During the relevant period, Bournewood's PHP operated from 9 am to 3 pm each day, excluding weekends and holidays.  Id.  Patients were typically enrolled in Bournewood's PHP between two to four weeks but could receive treatment for longer as their needs required.  Id.

Prior to 2007, Bournewood experienced difficulties with getting substance use recovery patients to attend the Brookline PHP regularly and on-time.  Id. ¶ 7.  To attempt to address the situation, Bournewood initially paid and provided substance use recovery patients with Massachusetts Bay Transportation Authority ("MBTA") subway passes and taxi vouchers in the hopes that defraying the cost of travel would increase the daily census of the PHP.  Id. ¶ 8.

In or around July 2003, Bournewood entered into a one-year affiliation agreement with a sober home, Twelve Step Education Program of New England ("Twelve Step").  Id. ¶ 9.

In the affiliation agreement with Twelve Step, Bournewood agreed to "purchase 2 sober beds" on the second floor of a sober home operated by Twelve Step at 171 Old Cambridge Road in Woburn, MA at the current resident rate of $18.60 per day.  Id. ¶ 10.  If one of the beds Bournewood "purchased" was occupied by a substance use recovery patient not enrolled in Bournewood's PHP, Twelve Step was required to credit the daily rate back to

[12]

Bournewood.  Bournewood also agreed to transport patients to and from the defendant's PHP and Twelve Steps daily.  Id.  In exchange, Twelve Step agreed to provide lunch at Bournewood's Woburn PHP to Twelve Step and non-Twelve Step substance use recovery patients attending the defendant's PHP.  Id.

One year later, Bournewood and Twelve Step entered into a new affiliation agreement effective July 1, 2004, that removed the provision regarding the purchase of beds but retained the transportation and lunch provisions.  Id.

On or about October 11, 2007, Bournewood and New England Transitions ("NET"), a Medford-based sober home, entered into an affiliation agreement in which Bournewood agreed to "reimburse [NET] $560.00 per bed per month (4 weeks) for two [NET] sober beds available to clients referred by Bournewood's clinical staff" and "[r]eimburse [NET] a per diem rate of $20.00 for additional clients in need of such services when the two Bournewood beds are occupied."  Id. ¶ 11.  NET agreed to "[m]aintain the expectation that clients in Bournewood's designated beds regularly attend Bournewood's [PHP]" and provide Bournewood with a "monthly invoice for charges plus number of days each Bournewood client occupied a designated sober bed." Id.

On or about February 3, 2009, Bournewood entered into an affiliation agreement with New Horizon House sober home ("New

Horizon"), which had a principal address in Quincy, but sober homes located throughout Massachusetts. Id. ¶ 12. Carl Smith owned and operated New Horizon. Id.

According to the terms of the affiliation agreement, Bournewood agreed to pay "$560 per bed per month (4 weeks) for two [New Horizon] sober beds available to clients referred by Bournewood's clinical staff" and "a per diem rate of $20 for additional clients in need of such services when the two Bournewood beds are occupied." Id. ¶ 13. New Horizon agreed to "[m]aintain the expectation that clients in Bournewood's designated beds regularly attended Bournewood's [PHP]." Id.

In February 2009, executives from Bournewood contacted Perry to discuss Bournewood's need for sober housing. Id. ¶ 14. The executives were Jenny Raffa ("Raffa"), then Bournewood's Director of Social Services and Ambulatory Care, and Jim Curran ("Curran"), Bournewood's Director of Admissions and Community Relations. Id. Raffa and Curran told Perry that Bournewood was interested in utilizing RES to house patients enrolled in and attending its PHP. Id.

Shortly after, Perry met with Raffa and Curran at Bournewood, at their invitation, to continue discussing Bournewood's interest in utilizing RES. Id. ¶ 15. After this initial meeting, Perry also met with Ray Robinson, then Bournewood's President. Id.

[14]

During the meeting Raffa, Curran, and Robinson ("Bournewood's executives") told Perry that Bournewood had contracted with two other sober homes, NET and New Horizons, to house patients attending Bournewood's PHP program.  Id. ¶ 16. The Bournewood executives explained, however, that Bournewood had difficulties getting IOP patients, encompassing PHP patients, that Bournewood housed at NET in Malden, MA and New Horizons in Quincy, MA to Bournewood's IOP on a daily basis. Id.  At the time, Bournewood, which lacked vehicle transport, gave IOP patients pre-paid subway and bus passes and taxicab vouchers to travel from NET and New Horizons to Bournewood and back each day.  Id.

The commute, which lasted an hour or more, resulted in IOP patients ceasing to come to Bournewood's IOP out of frustration with the length of the commute or arriving late.  Id. ¶ 17. Robinson specifically expressed frustration to Perry that Bournewood was losing IOP patients due to these transportation challenges with NET and New Horizons.  Id.

Bournewood executives told Perry that they believed RES could be a potential solution.  Id. ¶ 18.  RES, located in Roxbury, was approximately five miles from Bournewood and thus much closer to Bournewood than NET and New Horizons.  Id.

At the same meeting, Bournewood executives extended a
contract to RES.  Perry verbally agreed and Bournewood housed
its first IOP patient with RES in February 2009.  Id. ¶ 19.
Bournewood and RES subsequently memorialized their affiliation
agreement on or around June 12, 2009 ("June 12, 2009,
agreement").  Id. ¶ 20.  The June 12, 2009, agreement provided
that Bournewood would pay RES $720 to rent two beds per month to
house Bournewood's IOP patients.  Id.  Bournewood further agreed
to pay RES $24 per day, including weekends and holidays, for any
additional beds utilized by Bournewood.  Id.

Initially, Bournewood verbally agreed to transport its IOP
patients housed at RES to and from Bournewood and RES each
weekday.  Id. ¶ 21.  But the June 12, 2009, agreement stated
that RES was responsible for "provid[ing] transportation to
Bournewood's PHP daily . . . [and] Bournewood would transport
clients back to [RES]."  Id.

Despite the transportation provision in the June 12, 2009,
agreement, Bournewood conducted both afternoon pick up and drop
off from Bournewood to RES each day, with RES providing such
transportation on an "as needed basis."  Id. ¶ 22.  Further in
the June 12, 2009 agreement, Bournewood and RES mutually agreed
that "responsibility for the coordination of this affiliation
rests with the respective directors of the affiliating parties."
Id. ¶ 23.

[16]

Perry signed the June 12, 2009, agreement on or about June 16, 2009 as RES' "Director of Services." Id. ¶ 24. In and around 2011, Perry met with Raffa and Curran again. Id. ¶ 25. During this meeting, Raffa and Curran requested that RES become more involved in transporting Bournewood's PHP patients to and from RES and Bournewood each day. Id.

Perry agreed, utilizing his own vehicles to facilitate the transport. Id. ¶ 26. He sent vehicles from RES to Bournewood three times a day: at 9 a.m. for the start of IOP services; at noon for IOP patients only attending half days; and at 3 p.m. for end of day pick up. Id.

In 2013, a hand-written note was added to the June 12, 2009 agreement, increasing the daily rate per bed utilized by all of Bournewood's patients housed at RES to $30 from $24. Id. ¶ 27. Perry advocated for the increase in the daily rate per bed from $24 to $30 from Bournewood because he was providing Bournewood PHP patients with needed services. Id. ¶ 28. Perry recalls that Curran of Bournewood suggested that he advocate for the increase in the daily rate. Id.

As of 2013, the $30 daily rate per bed exceeded RES' rate for self-paying residents. Id. ¶ 29. In mid-2014, Bournewood executives contacted Perry and requested that RES take over the responsibility of transporting all IOP patients from RES to Bournewood. Id. ¶ 30.

[17]

Subsequently, Bournewood requested that RES pick up new patients from an estimated 30 referring treatment facilities located as far south as Fall River, as far north as Lowell and Methuen, and as far west as Worcester and Georgetown, MA.  Id. RES brought Bournewood's patients to RES in the afternoon and evening before the patients began their treatment at Bournewood's IOP the next morning.  Id.  At the request of Bournewood, Perry personally picked up many new Bournewood IOP patients from the outside referring treatment facilities and programs.  Id. ¶ 31.

For patients receiving a daily dose of methadone, RES agreed to Bournewood's request to transport patients to and from a methadone clinic each morning before 9 a.m. before transporting them to Bournewood.  Id. ¶ 32.

On or around September 1, 2016, Bournewood and RES entered into a new affiliation agreement ("September 1, 2016, agreement").  Id. ¶ 33.

Bournewood informed RES in August 2016 that Bournewood would be downsizing its transportation fleet and asked RES to take over complete responsibility of transporting patients to and from RES and Bournewood.  Id. ¶ 34.

The September 1, 2016, agreement restated the provisions in the June 12, 2009, agreement including Bournewood's agreement to reimburse RES $30 per night per patient Bournewood housed at RES

and RES's responsibility to transport patients from Bournewood each day.  Id. ¶ 35.  Both the June 12, 2009, agreement and the September 1, 2016, agreement contained a requirement that RES "maintain expectation that clients in Bournewood's designated beds regularly attend Bournewood's [PHP]."  Id. ¶ 36.

The September 1, 2016, agreement also provided that "the responsibility for the coordination of this affiliation rests with the respective directors of the affiliating parties."  Id. ¶ 37.  Perry signed the September 1, 2016, agreement on or about September 22, 2016, as RES' "Director of Services."  Id. ¶ 38.

On or around April 12, 2017, RES' director, Nick Lukasiak ("Lukasiak"), had a meeting with Bastide, and Curran.  Id. ¶ 39.  RES presented Bastide and Curran with a "'Memorandum of Services' provided exclusively to the patients of the intense (sic) out-patient day program Bournewood Hospital Chjestnut (sic) Hioll (sic) location" at the meeting.  Id.  The memorandum, from Perry and Lukasiak, set out the "services provided to patients of the Bournewood Out-Patient Day program while in residence at [RES]."  Id.  Perry delineated that RES provided Bournewood's PHP patients housed at RES the following services:

    a. "Transportation To/From Bournewood Hospital"
    b. "Transportation of New Referral Patients to RES
       from Outside 'Referring Treatment Facilities'"

[19]

c. "Transportation of Current Patients to 'Outside Medical Appointments' & 'Placement Interviews' at Halfway Houses, Holdings[,] and Work Programs"
d. "Transportation of Graduated Patients to 'After Care Facilities' (As Needed) to Facilitate the Realization of the After Care Plan"
e. "Transportation of Current Patients to Local Methadone Clinics"
f. "Daily Reporting of Attendance Census/Behavioral Issues"
g. "Urine Testing"
h. "Bedding Upon Entry"
i. "'Welcome Gift Bag' for All New Bournewood Patients Arriving to RES" including "food; soap and toothpaste; toilet paper; bowls, cups, plasticware; snack crackers, candy."

Id.

Perry learned that between 2009 and 2018, Bournewood contracted with at least five other sober homes to house Bournewood's PHP patients.  Id. ¶ 40.  It was his understanding, however, that RES was the "primary sober house" Bournewood used and that RES "always remained the principle sober house utilized by Bournewood to house the majority of its [PHP] population" during those years.  Id.

Over time the relationship grew to a point where Perry "remained in close contact with seemingly every staff member working at the Bournewood IOP."  Id. ¶ 41.  Perry "made certain that [he] was always responsive to the IOP's needs and/or requirements during the entire term" of RES' relationship with Bournewood.  Id.  He "regularly communicated 3-4 times daily with Scott Deagle ("Deagle") [Bournewood's Lead Intake

Coordinator]." Id. Because Perry was often personally
transporting patients to and from RES and Bournewood, he "had
the opportunity to meet with Deagle in person every morning and
every afternoon to discuss the IOP's new or discharged
patients." Id. Perry was often "approached by several of the
IOP clinicians and social workers to answer questions regarding
how their patients were doing at RES during the previous 18
hours that their patients were not receiving treatment." Id.

Between February 2009 and June 2018, Perry estimated that
Bournewood housed 3,000 or more patients at RES. Id. ¶ 42.
Bournewood made monthly payments to RES for housing PHP
patients. Id. ¶ 43. Perry deposited these sums in RES bank
accounts. Id. RES received from Bournewood between January
2015 and July 2018 the sum of $474,440. Id.

On numerous occasions, self-paying RES residents who were
struggling financially to pay the $160 weekly rent to stay at
RES, approached Perry about attending Bournewood's IOP program
so that Bournewood would pay their rent. Id. ¶ 44. On some of
those occasions, Perry contacted Deagle to relay the message
that "John Doe" a resident at RES, was interested in attending
the Bournewood IOP. Id.

Following instructions from Deagle, Perry would conduct a
urine drug test on prospective new patients of Bournewood and
transport them to Bournewood the next morning or to a hospital

for medical clearance, as directed by Deagle.  Id. ¶ 45.  Perry

had no ability or authority to admit a patient to Bournewood's

IOP or PHP program.  Id.

Bournewood, via Curran, paid RES monthly by check.  Id. ¶

46.  Bournewood would know how much to pay RES based upon

Bournewood's records, although Perry provided handwritten

"Bournewood Rent Charts" on a monthly basis that identified the

Bournewood patient residing at RES that month and the days they

resided at RES while attending Bournewood.  Id.  Generally,

Perry picked up the monthly check at Bournewood and deposited

the monies into one of three Citizens Bank accounts for RES of

which Perry was the sole signatory.  Id.

As part of RES' intake process, RES forms included sections

for demographics and insurance information to be completed by

residents.  Id. ¶ 47.  Perry, as RES' Director, knew that "a

large portion of Bournewood's patients had medical insurance

with MassHealth or Medicare."  Id. ¶ 48.

Neither Perry, nor RES, entered into any Medicare or

Masshealth payment or provider agreements.  Id. ¶ 49.  Sometime

during 2016, Bournewood executives told Perry that if a patient

arrived at Bournewood anytime after 10:30 am, Bournewood would

only be able to charge the insurance company for a half-day of

treatment.  Id. ¶ 50.

[22]

Perry learned that when a patient's treatment ended at Bournewood, for whatever reason, Bournewood would stop paying to house the patient at RES.  Id. ¶ 51.  Perry knew that most patients were typically left with no other housing options. Some discharged patients would stay at RES on a self-pay basis, but many were required to leave RES and take up residence at shelters and other transitional housing settings.  Id.

Perry did not participate in billing the government for any services rendered by Bournewood to its patients, at any point in time.  Id. ¶ 52.  Between 2007 and 2022, Bournewood entered into agreements with eight other sober homes.  Id. ¶ 53.  Though the length and details differ slightly with each agreement, all of the contracts followed a similar general construct to the one Bournewood entered into with RES.  Id.

Steps to Solutions is a sober home based in Dorchester, owned and operated by Peter McCarthy.  Id. ¶ 54.  Between September 2013 and March 2022, Bournewood paid to house 487 substance use recovery patients covered by federal healthcare programs at Steps to Solutions.  Id.

On or about December 1, 2016, Bournewood entered into an agreement with Milton Management, LLC, otherwise known as Faith House, which operated a series of sober homes in Dorchester, Roxbury, and Quincy.  Id. ¶ 55.  Faith House is owned and operated by Joseph Pizziferri.  Id.  Under the terms of the

agreement, Bournewood agreed to pay Faith House a per diem rate
of $30 for substance use recovery patients housed at Faith
House.  Id.  Faith House agreed to "[m]aintain the expectation
that clients in Bournewood's designated beds regularly attend"
Bournewood's PHP.  Id.

On January 31, 2018, Bournewood entered into a "Sober
Living Agreement" with Solutions Group, Inc. ("Solutions"), a
sober home in Dorchester operated by Thomas Lyons.  Id. ¶ 56.
Under the terms of the Sober Living Agreement, Bournewood agreed
to pay Solutions a one-time administrative fee per qualifying
patient of $100, and a rate of $25.80 per patient per night
housed at Solutions.  Id.  Unlike prior agreements with sober
homes, this agreement contained a provision requiring a
patient to qualify for free sober housing by evidencing
indigency.  Id.

On or about June 1, 2018, Bournewood entered into a Sober
Living Agreement with Angelos Development, LLC ("Angelos"), a
sober home located in Medfield, and owned and operated by Boris
Krants.  Id. ¶ 57.  Under the terms of the Sober Living
Agreement, Bournewood agreed to pay Angelos a one-time
administrative fee of $100 for each patient and a daily rate of
$29.57 per qualifying patient per night per bed.  Id.  A
qualifying patient needed to meet income requirements and "elect

to live at a residence of [Angelos] while participating" in Bournewood's PHP.  Id.

On or about August 1, 2018, Bournewood entered into a Sober Living Agreement with North East Special Needs Housing, LLC ("NESNH"), a sober home located in Dorchester, owned and operated by Michael D. Jordan.  Id. ¶ 58.  According to the terms of the agreement, Bournewood agreed to pay the rent for qualifying substance use recovery patients enrolled in and attending their PHP.  A qualifying patient needed to meet income requirements and "elect to live at [NESNH]" while participating in Bournewood PHP.  Id.  Unlike prior agreements with sober homes, however, Bournewood agreed to pay NESNH $900 a month for 6 exclusive beds for a monthly total of $5,400.  Id.  Bournewood agreed to pay NESNH in bi-monthly installments of $2,700.  Id.

On or about October 26, 2018, Bournewood entered into a Sober Living Agreement with A Vision from God, LLC, a sober home referred to as Brady's Place then based at 250 Seaver Street in Boston.  Id. ¶ 59.  The sober home, which relocated to Weymouth, is owned and operated by Daniel Cleggett.  Per the terms of the Sober Living Agreement, Bournewood agreed to pay $900 per month per bed for 24 beds for the exclusive use by Bournewood's male PHP substance use recovery patients beginning on November 1, 2018, and $900 per month per bed for an additional 6 beds for the exclusive use by Bournewood's female PHP substance use

recovery patients beginning on December 1, 2018.  Id.
Bournewood further agreed to pay an administrative fee of $75
per patient that resided in the sober home for more than 24
hours.  Id.

Bournewood routinely contacted referring facilities about
their PHP and advertised their offer of free sober housing.  Id.
¶ 60.  Bournewood's Lead Intake Coordinator for Outpatient
Services ("Lead Intake Coordinator") regularly communicated with
referring facilities' social workers about Bournewood's PHP and
offer of free sober housing.  Id.

Some substance use recovery patients who enrolled in and
attended Bournewood's PHP learned of Bournewood's offer of free
sober housing from other patients and sober home operators and
expressly sought out the free sober housing without referral
from a referral facility.  Id. ¶ 61.

After referral, Bournewood evaluated the substance use
recovery patient for admission to Bournewood's PHP.  Id. ¶ 62.
Bournewood also evaluated the patient for free sober housing if
they requested it.  Id.

Between May 2007 and December 2017, Bournewood's provision
of free sober housing was governed by an internal policy
entitled the "Sober Bed Free Care Policy."  Id. ¶ 63.  The
policy was revised in July 2009, July 2011, and June 2014.  Id.

[26]

Bournewood required substance use recovery patients receiving free sober housing to sign a "Partial Hospital Program with Sober House Agreement" ("PHP Sober House Agreement"). Id. ¶ 64. Bournewood also requested that patients initial certain statements in the PHP Sober House Agreement including, most importantly:

> a. "I understand that if admitted to Bournewood Health Systems PHP, it is expected that I will attend programing Monday through Friday between 9am-2pm. Attendance is expected, and unexcused absences typically result in administrative discharge from the program."
>
> b. "I understand that the average length of stay in PHP is about 2 weeks."
>
> c. "I understand that the cost of the sober house bed will only be covered by [the defendant] as long as I am admitted to the PHP program. If I choose to stay in the sober house after discharge from the PHP, I am responsible for the daily/weekly cost of the bed."

Id. Bournewood ended its relationship with Perry on or about March 2018. Id. ¶ 65.

On February 12, 2018, the Commonwealth of Massachusetts indicted Perry on two counts. Id. ¶ 66 Specifically, the indictments alleged that:

> a. On November 14, 2017, Mr. Perry did knowingly or intentionally manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance in Class B in violation of Mass. Gen. Laws ch. 94C, § 32A(a).
>
> b. On an unknown date, but occurring in 2017 through November 14, 2017, Mr. Perry conspired with other(s) to distribute a Class B drug to violate Mass. Gen.

[27]

Laws. ch. 94C, § 32A(a), in violation of Mass. Gen.
Laws ch. 94C, § 40.

<u>Id.</u>

On May 4, 2018, the Commonwealth of Massachusetts indicted

Perry on 34 counts.  <u>Id.</u> ¶ 67.  This included:

> a. Seven counts for Conspiracy to Distribute a Class
> B/E drug to violate Mass. Gen. Laws ch. 94C, § 32A(a),
> in violation of Mass. Gen. Laws ch. 94C, § 40 on
> diverse dates between 2016 and 2017;
>
> b. Two counts of Possession of Controlled Substances
> Class B in violation of Mass. Gen. Laws ch. 94C, § 34;
>
> c. One count of Possession of Controlled Substances
> Class C in violation of Mass. Gen. Laws ch. 94C, § 34;
>
> d. Three counts of Possession of Controlled Substances
> Class E in violation of Mass. Gen. Laws ch. 94C, § 34;
>
> e. Six counts for Sexual Conduct for a Fee in
> violation of Mass. Gen Laws ch. 272, § 53A(b) on
> diverse dates in 2012, 2013, 2014, 2016, 2017; and
>
> f. 15 counts for Tampering with Record or Other Object
> for Use in Official Proceeding in violation of Mass.
> Gen. Laws ch. 268, § 13E at diverse dates between 2012
> and 2017.

<u>Id.</u>

On or around October 2, 2019, Perry pled guilty to all 36

counts.  <u>Id.</u> ¶ 68.  The six (6) counts for Possession of

Controlled substances relate to drugs found at Perry's home in

Reading, MA on November 14, 2017, and not at RES in Roxbury.

<u>Id.</u> ¶ 69.

The Government asserts that Robert V. began residing at RES

on or around December 27, 2016, in conjunction with his

admission to Bournewood's PHP.  Id. ¶ 70.  Bournewood paid RES
to house Robert V. until January 27, 2017.  Id.  On or around
October 2, 2019, Perry pled guilty to one count of conspiring to
distribute drugs (Class C) with Robert V. on diverse dates
occurring in 2017 through November 14, 2017.  Id.  He also pled
guilty to four counts of altering, destroying, mutilating, or
concealing records, or attempting to alter, destroy, mutilate,
or conceal records regarding Robert V. on diverse dates in 2017
through May 9-10, 2017; 2017 through March 21, 2017; 2016
through January 5, 2017; and 2017 through February 14-15, 2017.
Id.

The six (6) counts for Sexual Conduct for a Fee involve
three (3) individuals.  Id. ¶ 71.  These charges relate to
conduct occurring in Reading, MA, and not at RES.  Id.

Justin K. was a resident of RES two (2) years prior to the
date of the crimes charged.  Id.  Mark D. was never a resident
of RES or patient of Bournewood.  Id.

Devin H. began residing at RES on or around January 13,
2011, in conjunction with his admission to Bournewood's PHP.
Bournewood paid RES to house Devin H. until January 20, 2011.
Id. ¶ 72.  Perry recalls that Devin H. had a 10 year
relationship with him.  Id.  Devin H. was a patient of
Bournewood for six (6) days during 2011 and a resident of RES

for eleven (11) days during 2011.  Id.  Perry was not charged or convicted of any crimes occurring during 2011.

On or around October 2, 2019, Perry pled guilty to three counts of paying, agreeing to pay, or offering to pay Devin H. to engage in sexual conduct on diverse dates between June 1, 2012 and June 1, 2013; January 1, 2014 and April 1, 2014; and November 14, 2017.  Id.

Perry recalls that the fifteen (15) counts for Tampering with Records concern letters sent to RES residents' probation officers that were allegedly inaccurate.  Id. ¶ 73.  He further recalls that the allegation was that the letters failed to portray the residents' sobriety efforts and the actual length of time they remained clean.  Id.  These letters were not shared with Bournewood, nor did Bournewood have any part in writing the letters.  Id.  All fifteen (15) counts concerned three (3) individuals: Justin K., Derek B. and Robert V.  Id.  Justin K. was never a patient of Bournewood.  Id.  Derek B. was never a patient of Bournewood.  Id.

Jacob R. began residing at RES on or around September 27, 2016, in conjunction with his admission to Bournewood's PHP. Id. ¶ 74.  Bournewood paid RES to house Jacob R. until October 3, 2016.  Id.  On or around October 2, 2019, Perry pled guilty to one count of conspiring to distribute drugs (Class B) with Jacob R. on diverse dates occurring in 2017 through November 14,

2017.  Id.  On or around October 2, 2019, Perry pled guilty to one count of conspiring to distribute drugs (Class B) with Jacob R. on diverse dates occurring in 2017 through November 14, 2017. Id.

Only one (1) of the counts for which Perry pled guilty concerned an active Bournewood patient (Robert V.).  Id. ¶ 75. The charge related to Perry writing an inaccurate letter to Robert V.'s probation officer in Salem District Court.  Id.

Perry has not been charged with, or sued for, any violation of the FCA, MFCA, or Massachusetts Medicaid False Claims Act ("MMFCA"), in conjunction with Bournewood's provision of free sober housing to patients to induce their enrollment and attendance in Bournewood's PHP.  Id. ¶ 76.

## IV.  ANALYSIS

Under the False Claims Act, a relator is entitled to "receive at least 15 percent but not more than 25 percent of the proceeds of the . . . settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action."  31 U.S.C. § 3730(d)(1) ("§ 3730(d)(1)").[3]  Perry asserts that he is entitled to 22% -- $1,400,000 -- of the settlement proceeds in this action.  Not so fast, counter the Governments.  They contend that Perry

---

[3] The parties agree that the analysis under the FCA and MFCA are identical, and therefore, only the FCA is analyzed.

"plann[ed] and initiate[d] the scheme together with Bournewood, which disqualifies him from **any** relator award." Gov'ts' Opp. 2 (emphasis added). Indeed, as matter of law, "[i]f the court finds that the action was brought by a person **who planned and initiated the violation of section 3729 upon which the action was brought,** then the court may, to the extent the court considers appropriate, reduce the share of the proceeds of the action which the person would otherwise receive under paragraph (1) or (2) of this subsection, taking into account the role of that person in advancing the case to litigation and any relevant circumstances pertaining to the violation." 31 U.S.C. § 3730(d)(3) (emphasis added). As here, where the Government contends that Perry "planned and initiated" the violation, the Government "bears the burden of proving that the relator was the planner and initiator of the fraud." United States ex rel. Marchese v. Cell Therapeutics, Inc., No. CV06-0168MJP, 2007 WL 4410255, at *8 (W.D. Wash. Dec. 14, 2007), aff'd sub nom. Zediker v. OrthoGeorgia, 857 F. App'x 600 (11th Cir. 2021) (per curiam). If the Governments meet their burden, Perry's "share may be reduced to zero percent." Id. at *7.

Further, "[i]f the person bringing the action is **convicted of criminal conduct arising from his or her role** in **the violation of section 3729,** that person shall be dismissed from the civil action and **shall not receive any share of the proceeds**

**of the action.**" 31 U.S.C. § 3730(d)(3)(emphasis added). Thus, "§ 3730(d)(3) authorizes a court in its discretion to reduce a relator's share of the proceeds due to his role in planning or initiating an FCA violation, and to outright deny a share of the proceeds if the relator is held criminally liable for the FCA violation." United States ex rel. Chiba v. Guntersville Breathables, Inc., 421 F. Supp. 3d 1241, 1251 (N.D. Ala. 2019) (emphasis added). Perry counters that he did not plan and initiate the conduct and that the statute cannot cover his criminal convictions.

After review of the stipulated facts, and after a full hearing, the Court rules that Perry take nothing from the settlement because (1) under Section 3730(d)(3) he is a "person who planned and initiated the violation of Section 3729 upon which the action was brought," or, alternatively, (2) under Section 3730(d)(3), Perry was "convicted of criminal conduct arising from his role in the violation of section 3729." 31 U.S.C. § 3730(d)(3).

As for the "planned and initiated" provision, as an initial matter, the Court wholly rejects Perry's contention of no knowledge or suspicion of wrongdoing before August 2021 as Perry claims:

> I had no idea Bournewood Hospital was committing any
> type of fraud or that the free housing provided by it
> to its patients residing at RES constituted a form of

> inducement or kick-back, until I discussed the bed
> leasing arrangement with my counsel in the weeks prior
> to the subject qui tam complaint being filed.  During
> August/September 2021, I approached my counsel to
> discuss Bournewood Hospital not making the final
> payments for beds leased back in 2018, as I wanted to
> pursue them for a breach of contract.  At that time,
> during August/September 2021, my counsel suggested to
> me that what Bournewood Hospital was doing appeared to
> be illegal.  I had no idea Bournewood Hospital was
> doing anything wrong prior to August/September 2021.

Perry Aff. ¶ 6.  As the stipulated facts circumstantially

confirm, and as further argued by the Governments: "Perry's

arrangement with Bournewood, which continued for nearly a

decade, resulted in Bournewood submitting thousands of false

claims tainted by kickbacks in the form of free sober housing --

the very allegation that forms the basis of the action he

brought" and resulted in the payment of $721,000 to Perry during

the relevant period.  Gov'ts.' Opp. 15-16.  Perry was at the

center of the kickback scheme.  It could not have existed but

for his planning and initiation; his feigned ignorance of the

details of the scheme on Bournewood's end, combined with his

involvement in a decade-long scheme from which he handsomely

profited, makes his protestations of innocence patently absurd.

Cf. Marchese, 2007 WL 4410255, at *9 ("Because [the relator]

held a **reasonable** belief that his actions were legal, the Court

concludes that [the relator] did not plan or initiate the scheme

and his share will not be reduced below fifteen percent")

(emphasis added).  On a preponderance of the evidence, this

Court rules that the Government has met its burden here. Accordingly, the Court in its discretion reduces the award to **zero** percent under 31 U.S.C. § 3730(d)(3).

Alternatively, Perry shall take nothing from the settlement because of his convictions arising from his role in the underlying FCA Violation under the "arising from" provision of Section 3730(d)(3). Absent any binding or persuasive authority as to the burden, the Court rules that the Governments have the burden of proof on the issue of whether Perry's convictions arise from his role in the fraud. See Marchese, 2007 WL 4410255 at *8. As an initial matter, the Court rejects Perry's assertion that the statute is ambiguous, and turns to application of the statute according to its plain and ordinary meaning.

There is little case law in this area. Both parties cite to Schroeder v. United States, 793 F.3d 1080 (9th Cir. 2015). There, the Ninth Circuit affirmed the dismissal of the relator after he pleaded guilty to conspiracy to commit fraud for submitting false time cards to his employer, who in turn received payment from the government. Id. at 1081-82. The Ninth Circuit addressed whether the statute required "the dismissal of all relators convicted of criminal conduct arising from the fraudulent conduct at issue in the qui tam suit, particularly minor participants who neither planned nor

initiated the fraudulent scheme." Id. at 1082. The Ninth Circuit reasoned that Section 3730(d)(3) "does not contain an exception for minor participants, and the statute does not indicate that it does not apply to relators like" the relator in that action. Id. at 1083. Notably, the issue of "arising from" nature of the crime was not in dispute. It is therefore unhelpful to the Court.

Turning to this case, Perry was convicted of several crimes "arising from" his role in the underlying scheme. The Court is persuaded by the Governments' argument that "arising from" does not require that Perry be charged with the same fraud. Rather, Perry's convictions arose from his **role** in the on-going participation in Bournewood's fraud. To be sure, the evidence reveals that Perry was preying upon the very individuals he was purporting to assist. Through residents at RES being enrolled in Bournewood's IOP, Perry had access to vulnerable recovering addicts, whom he engaged to distribute drugs, to engage in sex for a fee, and to falsify records.

The Court rejects Perry's attempt to distinguish, distance and minimize his criminal conduct. To be sure, Perry's criminal activities were not part of the fraud itself, but his crimes certainly were enabled by it. Perry claims that this is dispositive, citing a single case, United States ex rel. Green v. Serv. Cont. Educ. & Training Tr. Fund, 843 F. Supp. 2d 20, 28

(D.D.C. 2012) as persuasive authority.  Perry Suppl. 10.  In
that case, the district court explained in dicta that there was
"no indication" that crimes relating to bribery and theft of
employee benefit property "related to the FCA violations"
concerning false allegations of "fringe benefits provided to the
contractor's employees complied with the standards of the
McNamara-O'Hara Service Contract Act . . . and related
Department of Labor . . . regulations.  Id. at 25, 28 n.6.
Green stands for the proposition that a theft or bribery
"unrelated" to the scheme does not bar a relator's share.  Id.
Green, however, makes only a passing reference in a footnote to
this issue, and does not analyze the term "arising from" at all.
Id. at 28 n.6.  Its persuasive value here is therefore limited.

Perry's serious crimes, however, undoubtedly "arise from"
Perry's "role" in the scheme, as he would not have been able to
undertake that criminal activity with respect to the particular
patients without his participation in the fraud.  In the end,
the FCA, while designed to encourage those minor players in a
fraud to step forward, it is certainly **not** designed to reward
opportunistic criminals who participate in the fraud for a
decade, and use their fraud as an avenue to commit complementary
crimes -- here, to groom recovering addicts to become drug
distributors or to engage in sex for a fee.  While the First
Circuit has not addressed the scope of the statutory language at

[37]

issue, the Court is aware of no persuasive authority that counsels a different result.  As the Governments persuasively argue, "Perry leveraged his role as a housing provider in the kickback scheme to victimize recovering substance abusers, and now he seeks $1[,400,000] (22%) of the settlement recovery, on top of the $1[,000,000] that Bournewood already paid him to help facilitate its kickback scheme."  Gov'ts. Suppl. 11.  The Court is persuaded by this argument on the complete record before it.  Accordingly, the motion is DENIED on this alternative ground, and Perry must be DISMISSED from the action.  31 U.S.C. § 3730(d)(3).

## V.    CONCLUSION

The FCA cannot be used as a vehicle to profit by those who initiate and plan in an underlying fraud, or opportunistic criminals to profit from complementary crimes.  Perry falls within both of these categories and therefore, for the reasons stated above, the Motion , ECF No. 59, is DENIED and he shall take nothing from the settlement proceeds.  Because this Court has found that his convictions arise from his role in the fraud, he is DISMISSED from the action.  See 31 U.S.C. § 3730(d)(3) ("If the person bringing the action is convicted of criminal conduct arising from his or her role in the violation of section 3729, that person shall be dismissed from the civil action **and**

shall not receive any share of the proceeds of the action.")

(emphasis added).

**SO ORDERED.**

William G. Young

WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[4]

---

[4] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 47 years.